# COURT OF OYER AND TERMINER.

THE STATE *v.* JEREMIAH HARRIGAN.

*Murder—Defense—Drunkenness—Insanity—Cause for setting aside verdict.*

The continued visits of another to one's house after he has been forbidden to come there, or the belief or suspicion that he was guilty of adulterous intercourse with the wife of the occupant of the house, or odious comparisons made by him or an offer to fight, is no justifiable provocation for the act of shooting the intruder.

Evidence of the mental condition of the prisoner several months before the homicide committed by him is part of the history of the case and may be taken into account by the jury when considering the defense of insanity.

Drunkenness is no excuse for crime ; but actual insanity produced by continued dissipation is a good defense, as insanity from any other cause, and will relieve the prisoner from criminal responsibility.

In law the sanity of the accused is presumed and so continues until rebutted by proof to the contrary satisfactory to the jury.

Every irregularity which would subject a juror to censure—such as the drinking of ardent spirits, or separating without permission, or the approach of or conversations with strangers,—there being no reason to suspect that the irregularity had any influence on the final verdict, will not be sufficient grounds for setting aside the verdict.

(*New Castle, December 9, 1881.*)

24

INDICTMENT for murder of the first degree.

WALES, J., charging to the jury:

*Gentlemen of the Jury:* The prisoner, Jeremiah Harrigan, is indicted for the crime of murder of the first degree. The law of this State has established two degrees of murder, with a different penalty attached to each. It has also provided that a person indicted for murder may be found guilty of either degree, or of manslaughter, and this makes it necessary that we should explain to you, as briefly and as clearly as we can, these several crimes.

At the common law, murder was and still is, defined to be when a person of sound memory and discretion unlawfully kills a human being with malice aforethought, either express or implied. And the law of this State still recognizes this definition as the correct legal description of the crime, but makes the distinction between express malice and implied, the dividing line between murder of the first degree and murder of the second degree; so that now, the pre-existence of express malice is necessary to constitute murder of the first degree, and, when the crime has been committed with implied malice only, it is murder of the second degree.

Malice is the test of murder, and in a legal sense is the dictate of a wicked, depraved and malignant heart, and of a disposition to do an evil act, and may be either express or implied in law. Express malice is where one with a sedate, deliberate mind and formed design, kills another, and may be proved not only by words, threats, former grudges and ill will, but also by the selection of a deadly weapon, lying in wait and concerted schemes or plans to do him some great bodily harm. Implied or constructive malice is an inference or conclusion of law upon the facts proved, as when a person, unlawfully and suddenly kills another without premeditation or design, and without any, or without a considerable provocation, such as would reduce the crime to manslaughter; in such a case the law implies malice.

Whenever, therefore, a murder has been committed with the

deliberate and premeditated purpose of killing, it is evidence of express malice, and is murder of the first degree; but when the unlawful killing has been done suddenly without premeditation or design, but without sufficient provocation to reduce it to manslaughter, then it is murder with implied malice and is of the second degree.

Manslaughter is the lowest grade of felonious homicide, and differs from murder in this, that voluntary manslaughter arises from the sudden heat of the passions and is the unlawful killing of another without malice, either express or implied. It may be either voluntary, upon a sudden heat, or involuntary, but in the commission of some unlawful act. Generally it is the result of an actual combat, but the law in recognition of human weakness and infirmity of temper, makes some allowance for a sudden gust of passion or transport of rage caused by an actual assault, or a blow, or other great personal indignity. The act of killing, under such circumstances, is considered to have been done on adequate or sufficient provocation, and will be manslaughter only.

But in every case of homicide where provocation is pleaded in excuse or palliation, if there was a sufficient cooling time for passion to subside, reason to interpose and the judgment to resume its sway, and the person provoked afterwards kills the other, this is deliberate revenge and not heat of blood, and accordingly amounts to murder. And though there was not sufficient time for the passion to subside, yet if the case be attended with such circumstances as indicate malice in the accused, he will be guilty of murder. So that, if he provide himself with a deadly weapon beforehand in anticipation of the fight and not for the defense of his person, or if he took an undue advantage of the deceased, or if though he were in the heat of passion, he should designedly select out of several weapons equally at hand that which alone is deadly, it is murder.

Only sudden and great provocation will excuse the use of a deadly weapon. Insulting language, approbious epithets, or gestures expressive of contempt, without an assault, actual or threatened, on

the person, will not be sufficient if a deadly weapon be used, to reduce the offense below murder. There must be something more than words or gestures to constitute a sufficient or adequate provocation in such a case.

There is a special provocation recognized as adequate by the law, and that is where a husband finds a man in the act of adultery with his wife and kills him, the killing under such a provocation was only manslaughter, at common law, and the Statute of this State makes it a misdemeanor, merely, and punishable with slight penalties. But even under this extreme provocation the offended party must act at once, and in the first transport of passion. It is not necessary, however, that he should witness the act of adultery. If he saw the deceased in bed with his wife, or leaving it, or found them together in such a position as to indicate with reasonable certainty to a rational mind they had just then committed the adulterous act, or were then about to commit it, the effect will be the same; and if under such circumstances the mortal blow was given, the killing will be manslaughter merely. But no other knowledge on the part of the husband, however positive of their adulterous intercourse will suffice to mitigate and reduce the killing from murder to manslaughter. If, instead of killing the adulterer in the act, or at the time of the adulterous meeting, he kills him some considerable time afterwards, or on the ground of suspicion, or belief, this will not avail as any excuse.

It will be your duty, gentlemen, to apply the rules and principles of law, as we have just stated them, to the facts of the case now on trial, in order to form a just and true verdict.

As a starting point, it must be remembered that whenever a homicide has been committed deliberately or without provocation, the law presumes that it was done in malice, and it is incumbent on the prisoner to show from evidence, or by inference from all the circumstances of the case, that the offense is of a mitigated character and does not amount to murder.

It is not denied that on the night of the 10th of last Septem-

ber, near the village of Hockessin, in New Castle county, Jeremiah Harrigan took the life of Denis Shea by shooting him with a pistol. And it is also proved that the prisoner was an unlicensed vender of intoxicating liquors, and that Shea and his companions had gone to the prisoner's house on the night of the homicide, with the ostensible purpose of buying a quart of whiskey. The defense is threefold, to wit: First, that the accused was exasperated beyond endurance by the continued visits of the deceased to his house after he had forbidden him to come there. Second, that the belief or suspicion that the defendant was guilty of adulterous intercourse with the wife of the deceased was a provocation for the act of shooting; and third, that the accused, in consequence of long-continued and excessive use of intoxicating liquor, was either in such a condition of mental unsoundness, or bordering upon such a condition, immediately before and at the time of the shooting, as rendered him irresponsible for the act.·

It seems to be clear enough that, several months before the homicide, there had been a quarrel between the prisoner and Shea in the house of the former, and where Shea was boarding at the time, growing out of words spoken by the latter to the prisoner's wife, and in his hearing. The odious comparison made by Shea, on that occasion, between the accused and the "worthless character in Ireland," justified the prisoner in ordering him to leave the house and never to come there again. Shea left at once, obtaining permission, however, from the prisoner to return for his clothes, consent being given that he could make one trip for this purpose. From the testimony of the little girls, Mary and Ellen Harrigan, it appears that Shea did go back more than once, but how often is uncertain, and that he would be frequently seen in the vicinity of the prisoner's house and inquiring whether he was at home. Also, that on two occasions he called at the house in the evening when the accused and his wife were both absent. On the night of the homicide Shea entered the house in the manner detailed to you by the witnesses, Con. Creedon, Kelly and Lucy. These men were

present, and in conversation with the prisoner, who, on the mention of Shea's name threatened "If Shea came in he would knock more of the hair off him." Just at that moment Shea entered, and, walking across the room, said, "That's my name." Immediately the prisoner rose from his chair and told him to "clear out." The company suddenly broke up, Creedon and Lucy going out the front door, while Kelly and Shea left by the back door. The prisoner at the same time up stairs into another part of the house, having first obtained from his daughter Mary the key of a trunk or bureau. At the next scene in this drama, these five men—the prisoner, Shea, Creeden, Lucy and Kelly are on the turnpike, which runs past the prisoner's premises, between the barn and the house. Very few minutes could have elapsed as Shea, after leaving the house, walking through the garden and around the barn, had just come into the road when the prisoner was heard calling out something not understood by any of the witnesses who saw him coming down from the house. Shea, in spite of the remonstrance and interposition of one of the party went forward to meet the prisoner, when the latter was distinctly heard to say, "Denis, do you want to get killed," who replied, "no, but I'll fight you." The prisoner then said, "you had better keep away," to which Shea responded, "go home Jerry," go home Jerry," and at the same time raising his foot kicked at him, but the witness, Lucy, who was the nearest to the men, could not say whether Shea hit the prisoner or not.

In a second or two, the pistol shot was fired and Shea fell. The prisoner, passing the body of the deceased, came toward the witness and said to Lucy, "the man is dead now." Being told that he had no right to shoot him, he said, "you ought to have kept him away," again saying, "the man is dead now."

The three men who had accompanied Shea to the prisoner's house and saw what has just been described, alarmed by the fall of their companion and not knowing what the prisoner might do next, took to flight and went to their homes. Early on the following Sunday morning, when the magistrate and constable went to the

prisoner's house, they found him in an upper chamber,partly clothed and lying on a bed.   On being asked if he knew anything of the shooting on the previous night, he denied it, saying that he had come home drunk on Friday night and had not been out of the house since, not feeling very well.   He also denied the possession of a pistol, and further said that Shea had not been in his house for eight months.

Later in the day, after the magistrate had decided to commit him, he acknowledged the commission of the act and said, "It had to be done and I'll have to stand the brunt of it."   And afterwards, on the same day, while on the way to New Castle, in conversation with the constable who had him in charge, and notwithstanding he had been cautioned not to talk, he said "he had to do this thing," "that a man should be boss in his own house," "I had to do it.   If I hadn't done it this time, I would have had to do it some other time."

To the question why he did it he replied that he had heard this man talk about him to his wife and compare him to a worthless, good-for-nothing character in Ireland.   That he had then ordered him out of the house.   When first seen on Sunday morning, at 7.30 o'clock, by 'Squire Jackson, Constable Williamson and the witness, Kinsey, the condition and manner of the prisoner were about as usual; he did not appear to be drunk or excited, though Williamson thought he bore the traces of hard drinking.   The three companions of Shea testified that the prisoner was not drunk on Saturday night, but Fox told you that he had been drinking repeatedly all through that day, and there is testimony that he was intoxicated on Friday night, and was assisted by a policeman in Wilmington to a hotel.

We have called your attention to the acts, conduct and conversation of the prisoner immediately before, at the time of, and after the commission of the homicide, so that you may be able to judge of his motives and of his responsibility at that time.   It is true Dr. Mitchell said that he was called, on the 8th of July, to attend the prisoner, who was then suffering from the combined

effects of the heat of the weather and whisky, and was approaching the condition of mania-a-potu, but although the doctor saw him once or twice subsequently, and as late as the 29th of the same month he had never seen him in a pronounced attack of mania-a-potu.   This was at least a month before the homicide, but it is part of the history of the case and may be taken into account when considering the mental condition of the prisoner.   It has been so repeatedly decided by the courts in this State and everywhere else, that drunkenness is no excuse for crime, that it is only necessary to remind you that if the contrary rule were once established or permitted, society would be at the mercy of any one who chose to excite himself by drink for the purpose of committing crime and sheltering himself from its consequences by pleading intoxication.

The frenzy of drunkenness will not excuse a criminal act, but actual insanity produced by continued dissipation, will be a good defense.   The insanity which is the result of long and excessive indulgence in the use of liquor, must, in its effects, be similar to insanity produced by any other cause, to be a good legal defense, that is, it must amount to the deprivation of reason and judgment, and make the prisoner utterly incapable of forming a deliberate and premeditated design, of entertaining a rational thought or motive, of intelligently performing any act or of distinguishing between right and wrong.   Proof of insanity in any of these respects will relieve the prisoner from criminal responsibility.

And in this, as in every other case where insanity is set up as a defense, it must be proved, affirmatively, to the satisfaction of the jury, and not be left to conjecture and surmise.   In this connection you will bear in mind the testimony of Arthur Fox and of Mary Harrigan in reference to the state of the prisoner's mind throughout the whole of Saturday, on the night of which day the homicide was committed.   These witnesses spoke of the prisoner's hallucinations during that day, how he declared that he saw or heard burglars and inquired where they were, and how he heard strange noises, which nobody else saw or heard.   These representations, if true, and you

OPINION OF COURT.

are the judges of the credibility of the witnesses and of the truth of their statements, certainly show that the prisoner's mind and understanding were seriously affected and impaired.

You will have to carefully weigh this evidence and compare it with the testimony of Shea's companions, as to the prisoner's condition late on the same night, and with the evidence of Jackson, Williamson and Kinsley of his appearance the next morning; remembering that the legal presumption of the sanity of the prisoner continues and must stand until rebutted by proof to the contrary, satisfactory to the jury.

The crime of murder cannot be committed by one who is not of sound memory and discretion, for the law holds no person responsible, for his acts or conduct, who has been deprived of his reason and judgment by insanity, temporary or permanent. A person thus afflicted is to be treated as an object of compassion, and not as a criminal subject to legal punishment. You will review all the testimony on this subject as you heard it from the witnesses for the State, and from those for the prisoner; but, gentlemen, you must consider this defense separately from any other, for if the prisoner was insane at the time of the commission of the homicide, that will be sufficient to acquit him of crime, without considering any other matter of defense which has been presented to you in his behalf. If the existence of insanity has been proved to your satisfaction, the prisoner will be entitled to an acquittal on that ground, and we may say to you on that ground alone, because there is no evidence of any other justification, excuse or palliation for the killing of Shea that will relieve him from criminal responsibility. The visits of Shea to his house in defiance of the prisoner's command to keep away, the suspicion or belief of his wife's infidelity, if he harbored such belief or suspicion, of which there is no proof, the odious comparison, so often spoken of, and which naturally excited the prisoner's anger and indignation, nor the offer to fight—no one or all of these causes taken together will be sufficient to justify or excuse the use of the deadly pistol.

The going of Shea to the prisoner's house after what had oc-curred between them may have been improper and imprudent, but each visit was only a simple act of trespass and does not justify the destruction of a human life. His remark about the prisoner may have been and was injudicious and ungrateful, but no language or words, however offensive and taunting, will justify an assault and battery, much less a pistol shot. There is no proof of adulterous intercourse between Shea and the prisoner's wife, nor that the pris-oner's mind was affected by a floating suspicion of his wife's chastity. On the contrary he disavowed any belief of his wife's dishonor.

Aside, therefore, from the question of insanity, the prisoner is without defense on the testimony if you believe the evidence in re-gard to his threats and admissions. His acknowledged ill-will towards the deceased, his threat in the hearing of Quill last August, that he would shoot Shea or have his life, and his disclaimer after the shot had been fired of all regrets for what he had done, are enough to account for the motive of the deed and for the deed itself.

This is the legal effect and result of the evidence, if you be-lieve the witnesses for the State; but you are the sole judges of their credibility and of the truth of each and every part of the testimony which you have heard. Hou may accept as proved such portions as in your best judgment you believe to have been established, and reject the rest. You will do this with a proper sense of your obli-gation to discharge your duty and render a verdict according to the law and the evidence. In saying that, without the defense of in-sanity, the evidence furnishes no excuse for the prisoner, we do not intend or mean to suggest to you of what crime, if any, you should find the prisoner guilty. This is your office, and not ours.

We have defined the several crimes of murder of the first de-gree, of murder of the second degree, and of manslaughter, and in conclusion we will recapitulate those definitions as they have been heretofore concisely stated by this Court. First, Whenever there is design or intention deliberately proved in the mind to take life, and death ensues, it is murder with express malice and therefore

murder of the first degree.   Second, When there exists no design or intention to take life, but death results from an unlawful act of violence on the part of the slayer, and in the absence of adequate provocation, it is murder with implied malice, and therefore murder of the second degree.   Third, Voluntary manslaughter is the unlawful killing of another in the heat of blood, upon sufficient or adequate provocation, and without malice.

Finally, you will not convict the prisoner of any crime unless his guilt has been proved to your satisfaction beyond a reasonable doubt, and by this is meant a fair and honest doubt which, after a careful and serious examination of all the evidence will prevent you from being clearly satisfied of the prisoner's guilt.   Verdict guilty.

Motion for a new trial December 24, 1881.

WALES, J.

The reasons assigned in support of this motion may be reduced, in substance, to three:

1. The unauthorized separation of the jury during the progress of the trial.

2. The absence of one of the bailiffs having the jury in charge, the said bailiff having left the court house where the jury was kept and gone home to sleep; and

3. The drinking of intoxicating liquor by the jury without the consent of Court.

The first two reasons may be considered together, and we will say, at the outset, that the evidence produced to sustain them is not, in our opinion, sufficient to show that there was such serious misconduct on the part of either bailiffs or jury as to warrant the setting aside of the verdict.   Two bailiffs are appointed to keep and attend a jury in the trial of a capital felony, in order that one may relieve the other, and there was nothing grossly improper and derelict in Bailiff Deakyne, after watching the jury until after midnight,

going to his home, a short distance away, leaving the other bailiff, Frazer in charge, and returning to his post at or before sunrise. It would have been more regular had both bailiffs remained in the same building and near by the jury, but the short absence of Dea- kyne under the circumstances, the other bailiff remaining with the jury who were in their beds, could not possibly have worked any injury to the prisoner.

Then as to the separation of the jury—was there any such actual separation as ought to overturn this verdict? The purpose of keeping a jury in confinement, during the trial of a capital felony, is to shut out from them all extraneous and improper influ- ences, and to prevent the approach of all unauthorized persons so that their sentiments and judgments may not be affected by any communications to the advantage or prejudice of either the prisoner or the State. And, therefore, although there may be an actual sep- aration, yet if the proof is clear that there was no improper com- munication with the separated juror, or any conversation at all, the verdict will not be set aside for such irregularity. In the case be- fore us there is no evidence of any actual separation. The jury had the range of the upper part of the Court House, from which all persons were excluded, when the court was not in session, except the crier and watchman, who were sworn as general bailiffs, and two boys who assisted the crier in cleaning up. There is no ground for believing that any others had access to the jury, except those who delivered their meals, or were allowed by the Court to speak to them on business in the presence of one of the bailiffs, or that any improper communications were made to them. The playing of cards by some of the jury with the boy Enos, for a few minutes, on the first evening of the trial was an indiscretion, not amounting to a grave fault, and was not repeated, but it does not appear that any conversation was held in reference to the prisoner, or on any sub- ject other than the game in which they were engaged. The playing of cards or checkers, for amusement only, is a harmless diversion, and the boy testified positively that no remarks were made in refer-

ence to the trial. We throw out of view the testimony of young Cooper, who thought he saw one of the jurors on the balcony and was hailed by him with the remark that "they were having a hard time of it," because he first said that this occurred after the jury had retired to their room to make their verdict, which we all knew could not have been the fact. He afterwards corrected this statement, but his memory was evidently at fault about the time and his testimony is too indefinite to be depended on. The jury were in separate and adjoining rooms during the trial, at the recesses of the Court and at night, but were under the supervision of one or both of the bailiffs at all times, and the outer doors leading to the court room and the upper portions of the building were locked or guarded. They were allowed to walk in the court room, and may have separated in groups of twos or more, but this separation did not expose them to intrusion, and they were within sight or call of the bailiffs. Frazer and Deakyne expressly deny that they held conversations with any of the jury in reference to the case, and the crier testified that to an inquiry made of him by one of the jurors concerning the prisoner, he replied that he knew nothing and informed the juror that he must not talk to him on that subject. Nor does it appear that there was anything in either of the two newspapers found in the possession of the jurors on the second day of the trial and taken from them, in the way of reports, rumors or comments, that could possibly have affected their judgments in weighing and considering the testimony and forming their verdict. We have examined the authorities cited on these points by counsel in support of the motion, and find the general doctrine to be that actual separation of the jury, or communications or conversations from or with strangers, unexplained, will be good grounds for setting aside a verdict. The accidental approach of strangers, unless improper conversation is entertained, will not avoid a verdict. The presumption of law, where outside communication has been proved, is against the purity of the verdict, but this presumption may be overcome by positive evidence.

Now, here, all suspicion of improper communications is removed by direct evidence in every instance where there is proof of conversations or remarks in the hearing of, or by the jury, with the bailiffs, the crier, the boy Enos and the watchman, who all swear positively that no allusions whatever were made to the case on trial. There is no evidence of any other conversations or remarks, and those of which we have any evidence appear to have been of a trivial or casual character. As we stated in the beginning, the evidence does not sustain the first two reasons assigned for a new trial.

The drinking of wine or of ardent spirits by the jury, during the progress of the trial of a capital felony, may or may not afford sufficient ground for a new trial after a verdict of guilty, depending upon the circumstances of the particular case. The cases of *People v. Douglass*, 4 Cowen, 26, and of *Brant v. Fowler*, 7 Cowen, 562, cited in support of this motion, are no longer considered as law by the Court which decided them, having been overruled by *Wilson v. Abraham*, in 1 Hill, 207.

The rule enunciated in the cases reported in Cowen, that the use of ardent spirits by the jury, at any stage of the trial, in a civil or capital cause, will, *per se*, vitiate a verdict, is absolute and admits of no exceptions, is not now recognized as the correct and established doctrine. On the contrary, if it be proved to the Court, or otherwise appears, that though some or all of the jury may have used small quantities of intoxicating liquors, in the progress of the trial, but not in excess, or so as to disqualify them for the intelligent performance of their duties, such use of itself will not affect the verdict. In the prisoner's case, it is not claimed, or affirmed, that any of the jury were rendered unfit by their indulgence in liquor for the faithful and proper discharge of their important duties; and if this court had the slightest cause for suspecting that such had been the fact we should not hesitate for a moment to grant a new trial. But the small quantity of whisky sent by the landlord of the hotel from which the jury were supplied with their

meals, not exceeding one-half pint daily, for four or five days, was hardly enough to have seriously impaired the judgments of the few jurors who could have shared it among them. This indulgence in the use of liquor though slight was irregular, and the landlord who furnished and the jurors who drank the whisky are deserving of censure, and could be punished for contempt in acting as they did without permission of court. But it is not every irregularity of this kind, even in the trial of a capital felony, that will suffice to set aside a verdict of guilty.

In *Gregg v. McDaniel,* 4 Harrington, 367, which was a civil cause, the Court ordered a new trial because intoxicating liquors had been introduced into the jury room after the charge of the Court and pending the deliberation of the jury on their verdict, following the earlier New York decisions, which, as we have seen, have been overruled. But in *Gregg v. McDaniel* it is not stated how much liquor was introduced, or by whom. If in any considerable quantity, or by a party to the action and in whose favor the verdict was rendered, it would be a fatal objection always. Under the same circumstances as were shown in that case, we should render a like decision, but there is no proof or allegation that on the last day of the prisoner's trial, and after the jury had been charged and retired to their room to deliberate upon a verdict, any liquor at all was introduced or used. We are well assured that there was none. Applications for new trials are addressed to the discretion of the Court, and in every case that discretion must be exercised not alone with reference to general rules of law, but also to the special facts to which they are to be applied. We do not intend to lay down any rigid rule on this subject which must be enforced in all cases, for, as we have already said, each case must depend on its own peculiar facts and surroundings. The Court can, in any case, judge from the testimony and from its own observation, of the reasonable probability of the jury having been influenced by outside communications, or in the least degree incapacitated by intoxicating liquor, when making up their verdict. In the presence of

the Court and while the trial was in progress, the jury gave every mark of serious and thoughtful attention to the evidence, to the arguments of counsel and to the charge of the Court.    The Bailiff Frazer bore testimony to the unexceptional propriety of their behavior and conversation during the recesses of the court, and, in the absence of any sound reason or principle of law or practice, establishing an authoritative and rigorous rule, admitting of no exceptions we do not feel justified by all the circumstances of this case, in interfering with the verdict.

The general rule to be observed in considering an application of this nature is, that every irregularity which would subject a juror to censure, whether in drinking, or separating, or the like, have unless there be some reason to suspect that the irregularity may have had some influence on the final result of the cause, should not overturn the verdict. 1 *Hill*, 207. *Rom., v. The State.* 11 *Humphry*, 491.    Applying this rule to the facts of the present case, after a careful examination of the testimony and with the most solicitous regard for the rights of. the prisoner, we are compelled to refuse this motion.