## CALVIN TOLER v. THE STATE.*

### (*Nashville*. December Term, 1923.)

1. **HOMICIDE.** Facts held not to warrant verdict of second degree murder.

   Evidence of killing within an hour after being apprised that deceased had violated the chastity of defendant's sixteen year old daughter, and when defendant was under great passion and agitation, *held* not to warrant verdict of second degree murder. (*Post, pp.* 11, 12).

   Cases cited and approved: Fields v. State, 9 Tenn., 156; Galvin v. State, 46 Tenn., 283; Nelson v. State, 65 Tenn., 418; Draper v. State, 63 Tenn., 246; Quarles v. State, 33 Tenn., 407.

---

*On killing in heat of passion as affecting degree of homicide, see note in 5 L. R. A. (N. S.), 819.

On wife's confession of adultry as affecting degree of homicide in killing her paramour, see note in 10 A. L. R. 470.

Toler v. State.

2. **HOMICIDE.** Second degree murder and manslaughter distinguished.
Killing on a sudden heat of passion, without malice, distinguishes
voluntary manslaughter from murder in the second degree. (*Post,
p. 12.*)

3. **HOMICIDE.** When killing is ''manslaughter'' only stated.
It is not necessary to reduce killing to manslaughter that the passion
be so great as to render defendant incapable of deliberation or
premeditation; if circumstances are such as are calculated to pro-
duce such excitement and passion as would obscure the reason of
an ordinary man, and induce him, under such excitement and pas-
sion, to strike the blow that causes death, this reduces the killing to
"manslaughter." (*Post, pp. 13, 14.*)

Cases cited and approved: Seals v. State, 62 Tenn., 459; Haley v.
State, 123 Miss., 87; People v. Hurtado, 63 Cal., 288; Hill v. State,
64 Ga., 453; Bays v. State, 50 Tex. Cr. R., 548; Com. v. Moore, 2
Pittsb. R. (Pa.), 502; People v. Wood, 126 N. Y., 249; State v. Har-
rigan, 9 Houst. (Del.), 369; McCarty v. Commonwealth, 114 Ky.,
620; State v. Agnesi, 92 N. J. Law, 53; People v. Halliday, 5 Utah,
467.

## FROM CHEATHAM.

PARDUE & MARABLE and P. H. DUKE, for appellant.

WM. H. SWIGGART, JR., Assistant Attorney-General,
for the State.

MR. JUSTICE HALL delivered the opinion of the Court.

This is an appeal in error by Calvin Toler, who will
hereinafter be referred to as defendant, from a judg-
ment of conviction rendered by the circuit court of Cheat-
ham county, at its March term, 1923, of murder in the

second degree upon the body of one Ennis Harper, alleged to have been committed September 25, 1922. The judgment provides that defendant shall undergo confinement in the penitentiary for a term of not less than ten nor more than twenty years.

By the first assignment of error it is insisted that the evidence preponderates against the verdict and in favor of defendant's innocence.

The alleged homicide was committed shortly after noon on the date above mentioned in a field in which the deceased was at work. Defendant and deceased were neighbors, and lived within one hundred yards of each other at the time of the tragedy in question. They had been friends for several years and on the morning before the killing occurred, that afternoon, and up until about an hour before the tragedy, defendant had assisted one Steve Hooper in cutting and piling tobacco in the field where deceased was afterwards killed, which was located about one-fourth of a mile from the homes of defendant and deceased. Defendant and deceased were engaged in assisting Steve Hooper in cutting and piling his tobacco, and when the noon hour arrived Hooper invited defendant to accompany him and deceased to his house for dinner; to this invitation defendant replied that he would have to go home to dinner, and left for his home, telling Hooper that he would be back that afternoon to further assist him in cutting and piling his tobacco. The evidence is uncontroverted that when he left the tobacco patch at noon he and deceased were on perfectly friendly terms. The deceased was twenty-three years of age, married, and the father of two children. Defendant was forty-one years of age, married, and the

father of five children; among them was a young daugh-
ter, Jessie May, who lacked only a few days of being
sixteen years of age at the time of the alleged homicide.
Defendant also had a younger daughter, Christine, who
was nine years of age. Both of these daughters lived
in defendant's home and constituted a part of his family.

On his way home to dinner from the tobacco patch, de-
fendant met his brother-in-law, Joe Fogus, who lived
in the same neighborhood. Fogus told defendant that
his (defendant's) married daughter, Jerdie Garland, and
her husband, Eugene Garland, knew something in re-
gard to Ennis Harper (the deceased) and his daughter,
Jessie May, that he ought to know, and that he ought to
go and see them. Fogus further stated to defendant that
if his daughter and son-in-law told him anything, then
he (Fogus) would probably tell him something when he
came back. Fogus says that defendant told him he would
go and see Garland and his wife, and immediately left
and went in the direction of where Garland and his wife
were engaged in hauling hay on the Mat Hooper farm.
Defendant says that upon receipt of this information
from Fogus he did go to the barn where his son-in-law
and daughter were unloading hay from a wagon into the
barn. He says upon reaching the barn he asked his son-
in-law: ''What is that you know that Cap Harper don't
want you to tell me?'' It appears that deceased was com-
monly called Cap. His son-in-law replied, ''Ask Jerdie''
(referring to his wife and defendant's daughter). De-
fendant then says that he asked his daughter Jerdie what
it was. Defendant says that Jerdie then told him that
on an occasion about two months previous when defend-
ant, his wife, and all of his children except his daughter,

Jessie May, had gone on a visit to defendant's father, and had left Jessie May to stay with his married daughter, Jerdie Garland, until the family returned home, that in the afternoon she sent Jessie May out into the field near deceased's home to pick some blackberries, and that Jessie May stayed longer than she thought she ought to; that it was getting late, so she (Jerdie) went over into the field to find Jessie May and tell her to come home; that she went over into the field and around the edge of the hill, where the berries were to be found; that she went along between the corn rows, and when she got to the place where the berry patch was she saw Jessie May and deceased together; that Jessie May was lying down on the ground and deceased was on top of her in the act of violating her; that when she got within four or five steps of where deceased and Jessie May were that she asked, ''What in the world is the matter with Jessie May?'' That deceased replied, ''nothing, she is just drunk.'' Mrs. Garland said that she told deceased that she was going to tell her father (defendant), and that deceased said, ''If you do tell him, I will kill him;'' that she took hold of Jessie May and lifted her from the ground and took her home and put her to bed; that she had to help Jessie May home by holding her, as she appeared to be drunk; that Jessie May told her the next day that deceased persuaded her to take a drink of whisky out of a bottle which he had, he having come to where she was picking berries, after which she became dizzy; that she remembered deceased taking hold of her, and that was the last she remembered until she came to herself at her (Mrs. Garland's) house; that she had not informed him of deceased's conduct because she was

afraid the deceased would kill him; that the deceased had been to see her several times after the occurrence between him and Jessie May in the blackberry patch, and told her, and also her husband, that if they told him (defendant) he would kill defendant, and that defendant was not the only one he would kill. Mrs. Garland's husband, in his testimony, corroborated defendant's statement as to what Mrs. Garland told him. Mrs. Garland also testified that she made the statement above detailed to her father (defendant), and that it was true.

Defendant says that when his daughter told him what deceased had done it was a terrible shock to him; that he had never heard it before; that he thought the deceased was his friend, and had never suspicioned that he had mistreated his family in any way. Defendant also says that after his daughter Jerdie had told him what deceased had done to his daughter Jessie May, then his son-in-law, Eugene Garland, immediately told him that in August, after the occurrence between the deceased and Jessie May in July, he (Garland) went over to defendant's house on an occasion when no other member of the family was at the house except defendant's little daughter Christine; that when he got in front of defendant's gate he heard Christine crying and calling her mother; that he went into the house as soon as he could, as he knew Christine's mother was not at home, and when he entered the house he found that deceased had hold of Christine and seemed to be trying to throw her on the bed, and that Christine was crying and trying to get loose from the deceased. Defendant says that Garland told him that he asked the deceased what that meant, and that the deceased said that he was just teasing Christine, and then

Toler v. State.

left the house hurriedly. He says that Garland told him on this occasion that the deceased told him (Garland) that if he ever told him (defendant) what he had seen that he would kill defendant. Garland testified that he related this occurrence to defendant, and that it was true.

Defendant says that after his son-in-law and daughter had related these matters to him, he left and went towards his home; that on his way home he met Joe Fogus again. He says he told Fogus what his son-in-law and daughter had told him. He says that Fogus then told him that he could tell him something himself; that Fogus then told him that deceased had told him (Fogus) that Mrs. Garland had run up on him (deceased) and Jessie May in the edge of a cornfield; that deceased told him he had some whisky and gave Jessie May some, and then had improper relations with her; that deceased tried to get him (Fogus) to go and see his (defendant's) son-in-law and daughter, Mr. and Mrs. Garland, and get them not to tell defendant about the affair. Defendant says that Fogus told him that deceased said that if he (defendant) found out about the matter that he (deceased) would kill him. Defendant says that Fogus also told him that Harper told him (Fogus) in that conversation that if Mr. and Mrs. Garland did tell him (defendant) about the occurrence between him (deceased) and Jessie May he would not be too good to kill both of them.

This conversation with defendant by Fogus is testified to by the latter. Fogus also testified that he had the conversation with the deceased substantially as detailed by him to defendant.

Defendant says that, after having been informed by his son-in-law and daughter of the occurrence between

the deceased and his daughter Jessie May, and of the threats which deceased had made against him, and had also been informed of the statements made by the deceased to his brother-in-law, Joe Fogus, he went on to his home; that what he had heard kept bearing on him "heavier and heavier"; that when he reached home "he went in to the table and tried to eat a little dinner, but couldn't eat hardly anything"; that he soon left the table and went into the other room where Jessie May was fixing her hair, and asked her if what Mrs. Garland and Joe Fogus had told him about the deceased having made her drunk and assaulted her at the time she was picking blackberries for her sister Mrs. Garland was true. Defendant says that his daughter Jessie May then told him what had happened; that she told him that while she was there picking blackberries she heard some one speak; and that she turned around and saw the deceased standing near her. Defendant says that Jessie May told him that the deceased persuaded her to take a drink out of a bottle he had, claiming that it would not hurt her; that she finally took a drink and soon began to get dizzy; that the deceased then took hold of her and threw her to the ground; that she made an outcry, but that deceased put his hand over her mouth and got on top of her; and that she then remembered no more until she came to herself at the home of her sister Mrs. Garland.

Defendant says that after he talked to his daughter Jessie May, he was convinced of the truth of the statements which had been made to him by Mrs. Garland, her husband, and Joe Fogus. He testified:

"I believed that it was true. It shocked and hurt me so that I hardly know just what I did after that. I re-

member going to the barn, and stayed there a few minutes, and then reached in a tool box that I kept at the barn and got a pistol and put it inside by overall bib. I wanted it to protect myself, as I knew that Harper had said that he would kill me when I had found out about what he had done to my family. I went straight to the tobacco patch. . . . When I got to the tobacco patch which was only a short distance, and took just a few minutes to go there, Steve Hooper and Ennis Harper were there cutting tobacco. I passed Steve first, and he said something about the tobacco sun-burning, and I remarked to turn the butts towards the sun and it wouldn't burn. I then walked around Hooper and in front of Harper, who was a few rows up the hill, and said: 'Cap, you have been treating my family dirty. You said you were going to kill me if I found it out. Now is your time to do it.' Harper reached towards the ground like he was going after something. I thought he was going to get a gun, or knife, or something to kill me with. I thought he was fixing to kill me, and I reached and got my pistol and shot quick as I could. Harper fell to the ground, and I walked on down the hill. I do not know how many times I shot. . . . I thought he had a gun or knife or something hid there in the field, and was making an effort to use it when I shot. I did not go to Harper's back to shoot him. I was standing in front of him when I shot. Steve Hooper and Ennis Harper were about ten or fifteen feet apart when the affair happened. It was less than a hour from the time I heard of Ennis Harper's misconduct towards my family until the tragedy. I had always tried to raise my family right, and nothing never hurt me like the knowledge of Ennis Harper's misconduct

about ruining my little girl, and what he had done to my family. I had never heard about any of the matters until they were told to me on the day just before the killing. I had seen Harper carrying a gun almost everywhere he went for some time before the day of the trouble. I did not know what he was carrying it for until I heard about his conduct with my daughter and about his threats, and I then thought he was carrying it for me.''

Other witnesses testified to the fact that the deceased had been carrying a gun almost continuously for some time before the tragedy.

Defendant's daughter Jessie May testified that she made the statement detailed by her father, and that it was true. Another witness, James Aldrich, testified that he hauled logs in the summer of 1921, in the neighborhood of where defendant and deceased lived; that he boarded at defendant's home a part of the time while he was in that section, and a part of the time worked for defendant. He says that he knew the deceased; that the deceased had several conversations with him during the time he worked there, in which he talked about defendant's daughter Jessie May; that this talk of deceased was in regard to what he would like to do, if he was not afraid. Aldrich says that he advised deceased not to do those things, as he was a married man and would get into trouble. Aldrich says that at the barn one night deceased asked him if he had ever tried to get the girl to take a drink, and said to him (Aldrich), ''I believe that if a man could get her to take a drink of whisky he could do as he wanted to do,'' and said he was going to try it.

The record shows that Steve Hooper, who was present and witnessed the tragedy, was summoned as a witness by both the state and defendant, but was not introduced.

Deceased was shot through the neck, and one bullet entered the right side just below the ninth rib, ranged upward, and lodged just under the skin under the left nipple. He was instantly killed. At the time he was killed he had no weapon on his person, and there was no weapon about or near him on the ground.

Defendant's theory is that, in killing the deceased, he acted in his own necessary self-defense. He says, in substance, that he carried the pistol with him to the field where deceased was for the purpose of protecting himself; having been informed that deceased had threatened his life in the event he found out about his conduct with his daughter Jessie May. He says he went to the field where deceased was, after he had been informed of his conduct with his daughter, to see what deceased had to say about it. He says that when he asked deceased about his assault upon his daughter, deceased reached down as if to pick up something, and he thought deceased was about to make a deadly assault upon him, and that he shot deceased to save himself from death or great bodily harm. This, in substance, is the theory of the defendant.

Two witnesses introduced by the state testified that defendant stated within a few minutes afer he killed deceased that he killed him to protect his family, and that deceased had started to run when he shot. This statement was denied by defendant.

The jury did not accept the theory of defendant, and found that he did not act in his own necessary self-de-

fense, and in this finding we cannot say that the evidence preponderates against the verdict of the jury. We are, however, of the opinion that the facts did not warrant a verdict of murder in the second degree. It is undisputed that within less than an hour before he killed the deceased defendant had been informed of the outrage by the deceased of his young daughter. He was convinced of its truth, and, in all probability, it was true. This greatly shocked him and greatly aroused his passion, as it was calculated to do. Defendant, no doubt, from the time he was informed of this assault upon his young daughter until the shooting was done, was greatly agitated and was not capable of cool and deliberate thinking and reasoning, and killed the deceased while in this state of mind; in fact, we think the record fairly shows that this was the state of defendant's mind at the time he did the shooting. He says that he was greatly shocked and so bothered that he did not know what to do. At any rate his mental stress must have been great, and in view of the fact that less than an hour had elapsed between the time he received information of the assault by deceased upon his daughter and the shooting, there was hardly time for his passion to subside or cool. There could therefore have been neither malice, express or implied, in the killing of deceased under such circumstances.

"Manslaughter is the unlawful killing of another without malice, either express or implied, but upon a sudden heat of passion." *Fields* v. *State,* 1 Yerg., 156; *Galvin* v. *State,* 6 Cold., 283; *Nelson* v. *State,* 6 Baxt., 418; *Draper* v. *State,* 4 Baxt., 246; *Quarles* v. *State,* 1 Sneed, 407.

Killing on a sudden heat of passion, without malice,

distinguishes voluntary manslaughter from murder in the second degree. *Draper* v. *State,* supra.

It is not necessary to reduce killing to manslaughter that the passion should be so great as to render the defendant incapable of deliberation or premeditation. If the circumstances be such as are calculated to produce such excitement and passion as would obscure the rea son of an ordinary man and induce him, under such excitement and passion, to strike the blow that causes the death of the deceased, this will reduce the killing to man slaughter. *Seals* v. *State,* 3 Baxt., 459.

We think the facts of the instant case meet this test, and that defendant was improperly convicted of murder in the second degree.

In *Haley* v. *State,* 123 Miss., 87, 85 South., 129, 10 A. L. R., 462, a husband was being tried for the murder of his wife's paramour, and the evidence for the defendant showed that the accused was so aroused by the wife's confession of adultery that he neither ate nor slept, was in a constant state of agitation for two days, when, under great feelings, he shot the deceased "to protect his vows." It was held that his offense was not greater than voluntary manslaughter.

To the same effect is the holding of the court in *People* v. *Hurtado,* 63 Cal., 288; *Hill* v. *State,* 64 Ga., 453; *Bays* v. *State,* 50 Tex. Cr. R., 548, 99 S. W., 561.

In *Com.* v. *Moore,* 2 Pittsb. R. (Pa.), 502, the court, while recognizing this rule, held that where the defendant heard of the adultery about a week before the homicide, and the wife confessed to it a few hours before the homicide, there was no ground for holding that the offense was manslaughter rather than murder, since there

had been ample time for reflection after the defendant learned of the adultery.

See, to the same effect, *People* v. *Wood,* 126 N. Y., 249, 27 N. E., 362.

In a number of cases it has been held that if some time has intervened between the receipt of the information and the homicide, so that defendant's passion has had time to cool, the killing of his wife or her paramour is murder and not manslaughter. *People* v. *Hurtado,* supra; *State* v. *Harrigan,* 9 Houst. (Del.), 369, 31 Atl., 1052; *McCarty* v. *Commonwealth,* 114 Ky., 620, 71 S. W., 656; *State* v. *Agnesi,* 92 N. J. Law, 53, 104 Atl., 299; *People* v. *Halliday,* 5 Utah, 467, 17 Pac., 118.

This court has held, in more than one unreported case, that the killing of a person by another, under circumstances such as are shown in the instant case, was not murder. We think this is undoubtedly true where the defendant has not had sufficient time for his passion to cool after being apprised of the violation of the chastity of a female member of his family, and acts under a great state of passion or agitation, as the defendant in the in stant case evidently did. As before stated, defendant's daughter was not quite sixteen years of age. There is no evidence in the record tending to show that she was not, prior to the time that she was violated by defendant, a chaste female, or that she had ever been guilty of any immoral conduct.

This conclusion renders it unnecessary to determine the remaining assignments of error.

It results that the judgment of the court below will be reversed, and the cause remanded for a new trial not inconsistent with this opinion.