STATE of Tennessee, Appellee,

v.

**Jerry Wayne ESTES, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

March 28, 1983.

Permission to Appeal Denied by Supreme Court Aug. 1, 1983.

Delilah A. Speed, Speed & Walker, William A. Graham, Columbia, for appellant.

William M. Leech, Jr., Atty. Gen., Jerry L. Smith, Asst. Atty. Gen., Nashville, Robert H. Gay, Dist. Atty. Gen., Lawrenceburg, Robert W. Sands, Asst. Dist. Atty. Gen., Columbia, for appellee.

## OPINION

SCOTT, Judge.

The appellant was convicted of murder in the second degree and sentenced to fifty years in the state penitentiary. Much aggrieved by his conviction, he has presented nine issues for our consideration.

█ In the first issue he questions whether the court erred in requiring him to stand trial since he was incompetent to assist counsel during the course of the trial. Prior to trial defense counsel sought and was granted a court ordered evaluation of the appellant's competency to stand trial.

However, after the examination, no hearing was ever held on that issue. Counsel's failure to insure that the matter of competency was settled before trial amounted to a waiver of that issue. Rule 36(a), T.R.A.P. Further, the psychiatrist who examined the appellant to determine his competency to stand trial testified and his testimony was unrebutted. He stated that the appellant was, without any doubt, competent to stand trial. This issue has no merit.

Next the appellant wages a two pronged attack upon the sufficiency of the convicting evidence. First, he contends that the state failed to prove his sanity at the time of the offense beyond a reasonable doubt, and that the trial judge should have granted his motion for a judgment of acquittal by reason of his insanity. He contends that even if he was sane, the verdict of guilty of murder in the second degree is contrary to the weight of the evidence. He contends that the shooting occurred upon a sudden heat of passion produced by extreme provocation adequate to obscure the reason of an ordinary man. Hence, he asserts that the highest grade of offense for which he could be convicted is voluntary manslaughter.

The appellant; his wife, Audrey; William Boyd Morton; Mr. Morton's live-in girlfriend, Betty McClain; Betty McClain's son, Ronnie Isbell; Audrey's two children; and a man known as Uncle Joe all lived together at 5008 Trotwood Avenue in Columbia. Prior to Mrs. Estes' marriage to the appellant she and Wayne Runions lived together. Mr. Runions continued to be a very frequent visitor at the home, frequently coming to see Mrs. Estes. Even after she married the appellant, she had been seen with Mr. Runions, as well as other men, hugging, kissing, rubbing and putting hickeys on each other's necks.

At about 4:30 or 5:00 P.M., on September 16, 1980, Mr. Morton, Ms. McClain, Mrs. Estes and Mr. Runions went to a steak house for supper. The appellant was home and had been drinking beer during the afternoon. They invited him to go with them, but he declined. At about dark they arrived back and found the appellant sitting outside at a picnic table with Mr. Isbell. According to Mr. Isbell, the appellant was laughing and horsing around. Mr. Runions went to the store and got two six packs of beer and drank one of his beers. The appellant went to the liquor store and got a bottle of whiskey and switched to drinking that beverage.

Later that night, outside at the picnic table, the appellant and his wife got into an argument. The subject of the argument does not clearly appear in the record, but apparently some reference was made to her relationship with Mr. Runions. The argument apparently became rather heated and Ms. McClain went outside and told them to stop arguing. Mr. Runions, who had been inside watching television, went out and told the appellant and Mrs. Estes that he didn't want his name brought into it. The appellant told Mr. Runions that he had not been mentioned. Mr. Runions told the appellant, "I can take your wife and leave any time I want to, and you can't do nothing about it". The appellant replied that, "I got something for you if you do".

These men then argued and Mr. Runions invited the appellant out in the road to fight. The appellant stated that he was ready for Mr. Runions and went to an opening leading to the crawl space under the house. There he got a single shot .12 gauge shotgun which belonged to Mr. Morton. The appellant and Mr. Runions proceeded out toward the road where they stood and continued their conversation for a minute or two. In a short time the appellant shot the victim in the back at point blank range. The shot produced an entrance wound in the right mid-portion of the back about the size of an orange. The shotgun pellets caused massive hemorrhaging in most of the right lung and part of the left lung. An ambulance was summoned and the victim was taken to the emergency room at Maury County Hospital where medical personnel worked frantically to save him. However, Mr. Runions died from the hemorrhaging.

After the appellant shot the victim, Mr. Isbell grabbed the appellant, rode him to

the ground and took the gun away from him. The appellant returned to the picnic table where he sat down and waited for the arrival of the officers who arrested him. He never approached or looked at the victim's body. Three extra shotgun shells were found lying on the ground.

The appellant was indicted for murder in the first degree, and based upon this proof the jury found him guilty of murder in the second degree.

■ The willful and malicious, unlawful killing of a person upon a sudden impulse of passion, without adequate provocation, and disconnected with any previously formed design to kill is murder in the second degree. *Gordon v. State,* 478 S.W.2d 911, 916 (Tenn.Cr.App.1971).

■ In order to reduce second degree murder to voluntary manslaughter, it must be shown that the defendant acted upon a sudden heat of passion, *without malice.* *Toler v. State,* 152 Tenn. 1, 260 S.W. 134, 137 (1924). The use of a deadly weapon is sufficient to support a finding of malice. *State v. Gilbert,* 612 S.W.2d 188, 190 (Tenn. Cr.App.1980). Like all other questions of fact, the degree of homicide is a question for the jury's determination from the evidence. *Id.*

■ A jury verdict of guilty, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the theory of the state. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978). On appeal the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

■ There was ample, indeed overwhelming, evidence from which any rational trier of fact could find the appellant guilty of murder in the second degree beyond a reasonable doubt. Rule 13(e), T.R. A.P., *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2786–2792, 61 L.Ed.2d 560 (1979). This issue has no merit.

As to the question of the appellant's sanity, the appellant presented the testimony of Dr. Earl Parrott, a practicing psychiatrist. Dr. Parrott testified that, in his opinion, at the time of the crime the appellant was incapable of conforming his actions to the requirements of the law because of a mental defect or illness. The doctor testified that the appellant is mentally retarded, that he suffered from visual and auditory hallucinations, and that he had an overwhelming impulse which probably caused him to lose contact with reality.

Other witnesses testified that the appellant is retarded, doesn't act real bright, sits and stares, and likes to be alone. However, these witnesses also revealed that the appellant is an excellent, very dependable worker on his job and that, in spite of his penchant for solitude, he enjoys playing pool at honky tonks.

The state's psychiatrist, who was called in rebuttal, did not address the issue of the appellant's sanity at the time of the offense. Rather, his testimony related only to his competency to stand trial. To rebut the insanity defense, the state relied upon the testimony concerning the methodical acts of the appellant leading up to the killing, including the appellant's statements to Dr. Parrott concerning the preparations.

The state's proof concerning pre-crime preparation revealed that the shotgun belonged to Mr. Morton and was normally kept by him in his truck, which was parked at a barn approximately two hundred yards from the house. According to the proof in chief, the appellant had used Mr. Morton's truck that afternoon in order to boost the battery on his car. The state contended that it was during this time that the appellant took the shotgun from the truck and placed it under the house in preparation for the killing of Mr. Runions. The appellant told Dr. Parrott that he stole the shotgun from Mr. Morton in order to either sell or pawn it. He admitted that he got the gun from the truck and placed it under the house, contending that he broke into the truck with a coat hanger. He also admitted to Dr. Parrott that he got three extra shells

and put them into his pocket. In spite of all of Dr. Parrott's other testimony concerning the appellant's incapabilities, he admitted that the appellant was capable of remembering where he hid the gun and that, as far as he knew, the appellant had always been able to cope with various other emotional situations.

The American Law Institute Model Penal Code test of insanity has been adopted in Tennessee. Under this test, "a person is not responsible for criminal conduct if at the time of such conduct as the result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law". *Graham v. State,* 547 S.W.2d 531, 543 (Tenn. 1977). The law presumes sanity. *Brooks v. State,* 489 S.W.2d 70, 72 (Tenn.Cr.App. 1972). However, this presumption may be rebutted by a prima facie showing of insanity. Where there is evidence tending to show insanity at the time of the commission of the offense, the burden shifts to the state to establish beyond a reasonable doubt the defendant's capacity to appreciate the wrongfulness of his conduct and his ability to conform his conduct to the requirements of the law. *State v. Patton,* 593 S.W.2d 913, 915 (Tenn.1979). The state may establish a defendant's sanity by the use of expert testimony, lay testimony or by showing that the defendant's behavior at, or very near, the time of the commission of the crime was consistent with sanity and inconsistent with insanity. *Edwards v. State,* 540 S.W.2d 641, 646 (Tenn.1976). A jury is not required to accept expert testimony over lay testimony or evidence of his behavior near the time of the crime. *State v. Patton,* supra, at 916. The jury can grant each bit of evidence such weight as it deserves in light of all the facts shown.

When the issue is sanity, a reviewing court must be most wary of disturbing a jury verdict. In view of the complicated nature of the decision to be made—intertwining moral, legal and medical judgments—it will require an unusually strong showing to induce an appellate court to reverse a conviction where the jury has found a criminal defendant sane. *State v. Cherry,* 639 S.W.2d 683, 686 (Tenn.Cr.App. 1982).

In this case the medical testimony was that the appellant was insane. The lay testimony revealed essentially that he is retarded. The appellant's actions at the scene of the crime, particularly his secreting of the murder weapon several hours before the killing, revealed actions which were consistent with sanity and inconsistent with insanity. There was ample evidence from which the jury could conclude beyond a reasonable doubt that the appellant was sane at the time of the offense. Rule 13(e), T.R.A.P., *Jackson v. Virginia,* supra. This issue has no merit.

Next the appellant contends that the prosecutor improperly argued that if the jury found the appellant not guilty by reason of insanity that he would be evaluated and it would be left up to some psychiatrist to decide when he would be put back on the street. The allegedly improper argument to which defense counsel unsuccessfully objected was as follows:

Now, Miss Speed says he's insane, and that if you find him insane, what's going to happen to him.

Well, I'm sure—I guess the Judge will explain that to you, but if you find him insane, they take him and put him in a hospital till a psychiatrist says he's ready to come home, and he goes home.

The argument was a misstatement of the law. TCA § 33–709 provides that when one is acquitted by reason of insanity at the time of the commission of the offense, the criminal court shall order the person detained for diagnosis and evaluation for not less than sixty days nor more than ninety days at a hospital or treatment resource. Following that diagnosis and evaluation, upon certification that he is mentally ill, poses a likelihood of serious harm and is in need of care and treatment in a mental hospital or treatment resource, the District Attorney shall petition the criminal court for judicial hospitalization. The court may

so order or may order the person to seek out-patient treatment. TCA § 33–709(e) requires the criminal court in a jury trial in which the issue of insanity at the time the commission of the offense is raised to instruct the jury concerning the provisions of that section, and the trial judge did so in this case.

When improper arguments by the District Attorney General are considered, our courts look to five factors to determine whether the verdict was affected to the prejudice of the defendant. *Judge v. State,* 539 S.W.2d 340, 344 (Tenn.Cr.App.1976). These factors are:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

■ The conduct was minor in light of the facts and circumstances of this case. The trial judge undertook no curative measures at the time, but the jury was properly instructed during the charge. The prosecution's intent at the time of the improper statement was obviously to press the jury to convict the appellant. However, it was an isolated misstatement. This was a strong case for the proof was unrebutted that the appellant shot the victim. The only real issue was sanity. The cumulative effect of the improper conduct with other errors in the record was nil, since there were no other errors in the record. Therefore, while the argument was improper, it was entirely harmless. Rule 52(a), T.R. Cr.P., Rule 36(b), T.R.A.P. This issue has no merit.

Next the appellant contends that the jury acted improperly in considering probation, parole and good time and in speculating on the effects thereof in determining the sentence. He also contends that the jury improperly considered extraneous matters, including information that he was a bouncer at the Forty Three Club. The appellant also contends that the jury improperly inferred that by his failure to take the stand that he had a prior criminal record. Concerning the appellant's employment as a bouncer and the jury's inference about him having a criminal record, there is absolutely nothing in the record to support these contentions. Therefore, these issues have no merit.

At the hearing on the motion for a new trial, one of appellant's defense counsel contended that after the trial one of the jurors approached her and told her that the jury had taken into account the likelihood of parole and the effect of good time in setting the sentence. She did not testify about this alleged incident. However, two jurors were called to testify. The first juror refused to answer any questions concerning the discussions in the jury room. The trial judge, respecting the sanctity of the jury room, excused him.

The second juror admitted that he asked defense counsel or someone about how long the appellant would have to serve if he received a thirty year sentence and also asked if there was a chance that the appellant could be paroled. However, these questions were asked after the trial was over and the jury had been discharged. He did not indicate that these matters were discussed in the jury room. They had discussed a sentence of sixty years as part of their deliberations and his curiosity about these matters was thus aroused.

■ It is improper for a jury to speculate on future events which may affect the length of a defendant's sentence such as the accumulation of good and honor time or discretionary parole. *Farris v. State,* 535 S.W.2d 608, 614 (Tenn.1976). However, the rule in Tennessee is the one set forth in Rule 606(b), *Federal Rules of Evidence,* which provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement

occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about what he would be precluded from testifying be received for these purposes.

*Montgomery v. State,* 556 S.W.2d 559, 561–562 (Tenn.Cr.App.1977). Hence, the only time a juror can testify concerning the jury deliberations is when extraneous or prejudicial information was improperly brought to the jury's attention, or when there has been outside influence improperly brought to bear upon any juror. The record contains no evidence that either of those situations occurred. Hence, this issue has no merit.

The appellant further contends that the trial judge erred by failing to allow the appellant to present proof concerning the issue of the jury's consideration of prejudicial extraneous matters.

After the two jurors were called the appellant's counsel was not allowed to call two additional jurors to testify concerning what occurred in the jury room. However, it was obvious to the trial judge and to this Court that counsel was simply on a "fishing expedition" to try to find something prejudicial. Having not already investigated and determined that something prejudicial had occurred and having no concrete proof to present, the trial judge did not err in preventing counsel from calling the additional jurors to attempt to impeach their verdict.

In the final issue the appellant contends that the trial judge erred in holding an *ex parte* hearing in chambers without the presence of the defendant.

The discussion of this issue at the motion for a new trial revealed that the hearing was not *ex parte,* but that both the prosecutors and defense counsel went into the judge's chambers during the lunch break just prior to the beginning of the jury's deliberations. One juror had questioned the propriety of his continued service, since he was a friend of Babs Walker, defense counsel's law partner. This matter was discussed by counsel and the court outside the appellant's presence. The court reporter was not present and there is no record of the discussion. However, counsel candidly admitted that they participated in the discussion and registered no objection. Objections to improper procedure must be voiced contemporaneously to give the trial judge the opportunity to correct the error on the spot. In the absence of a contemporaneous objection, any error was waived. Relief is not available to a party who does not take whatever action is necessary to prevent or nullify the harmful effect of the alleged error. Rule 36(b), T.R.A.P. Furthermore, counsel has failed to brief this issue. The issue was also waived for that reason. Rule 27(a)(7), T.R.A.P. Finally, the defendant need not be present at a conference upon a question of law. Rule 43(c)(3), T.R.Cr.P. Apparently, that was what this was. This issue has no merit.

Finding all of the appellant's issues devoid of merit, the judgment is affirmed.

DAUGHTREY and TATUM, JJ., concur.