IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2005

## STATE OF TENNESSEE v. MICHAEL ORTIZ

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-00772     James C. Beasley, Jr., Judge**

─────────────

**No. W2005-00474-CCA-R3-CD  - Filed February 8, 2006**

─────────────

The defendant, Michael Ortiz, was found guilty by a Shelby County Jury of possession of a controlled substance with intent to sell, to wit: cocaine over 300 grams. He was sentenced as a Range I, standard offender to twenty years in the Department of Correction. On appeal, he argues the trial court erred in denying: (1) his motion to suppress evidence obtained from a search of his vehicle; and (2) his motion to suppress his statement given to police. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

David Bell and Michael Johnson, Assistant Public Defenders (at trial), and Garland Ergüden, Assistant Public Defender (on appeal), for the appellant, Michael Ortiz.

Paul G. Summers, Attorney General and Reporter; Brian C. Johnson, Assistant Attorney General; William L. Gibbons, District Attorney General; and J. Robert Carter and Valerie Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The defendant's conviction is a result of a routine traffic stop in Shelby County, Tennessee. The defendant, who gave police consent to search his van, was arrested after 18.5 pounds of cocaine was located in a hidden compartment of his vehicle. After his arrest, the defendant gave a detailed statement to police officers acknowledging that the cocaine was his and that he was transporting it from Las Vegas, Nevada, to Myrtle Beach, South Carolina, to sell. On February 6, 2003, he was indicted by the Shelby County Grand Jury for possession with intent to sell over 300 grams of cocaine (Count 1) and possession with intent to deliver over 300 grams of cocaine (Count 2). On

June 23, 2004, the defendant filed motions to suppress both the cocaine found in his vehicle and his statement to the police. Subsequently, the trial court held a suppression hearing and issued findings and conclusions from the bench, denying the defendant's motions. Following a jury trial, where the defendant was convicted of both counts, the trial court merged Counts 1 and 2 and sentenced the defendant to twenty years.

On appeal, the defendant argues that he did not have the mental capacity to consent to the search of his vehicle or give a knowing and voluntary confession.

**Suppression Hearing**

Officer Chris Jones testified that on November 6, 2002, he and Officer Marco Yzaguirre, both assigned to the West Tennessee Drug Task Force's Interstate Interdiction Unit,[1] stopped the defendant's van after he "clocked" the defendant going 66 miles per hour in a 55 mile per hour zone on Interstate 240 with a calibrated stationary radar unit.[2] Officer Jones's in-car video camera recorded the entire stop. As he approached the driver's side window of the van, Jones "smelled the odor of burnt marijuana coming from the interior of the vehicle." The officer asked the defendant to exit the van, whereupon the defendant acknowledged traveling at 65 miles an hour. Accompanying the defendant was a young female passenger, Ms. Ortiz,[3] whom he claimed was his cousin.[4] The defendant told Jones that he was traveling from Las Vegas, Nevada, to South Carolina for his uncle's funeral, but he did not know which city he was going to.

Jones, after placing the defendant in the backseat of his police car, approached the passenger side of the van to talk to Ms. Ortiz, where he again smelled "burnt marijuana." Ms. Ortiz told the officer that the defendant was her brother and that the smell he detected "may have been a cigarette burning." While Jones was talking to Ms. Ortiz, Officer Yzaguirre asked the defendant for consent to search the van. The officers had also contacted a canine officer "to bring his trained narcotic canine to the scene." Prior to searching the van, Jones discussed the marijuana smell with the defendant who acknowledged having marijuana in the car. Jones immediately advised the defendant of his Miranda rights and the defendant said there was a "joint" in the van and offered to show the officers its location. After the canine unit arrived, the van was searched and Jones found "hidden

---

[1] Officer Jones was employed by the Shelby County Sheriff's Department, and Officer Yzaguirre worked for the Memphis Police Department.

[2] Jones testified that he was certified to use the radar unit and explained that he "checked the internal calibration on the unit itself" prior to starting his shift that same morning.

[3] Ms. Ortiz's first name is not clear from the record. She was variously addressed as "Elisha," "Angelica," "Angelina," "Angela," and "Angelique" by different witnesses. For ease of writing this opinion, we will refer to her as Ms. Ortiz.

[4] Ms. Ortiz's exact relationship to the defendant is also unclear from the record. She was ultimately best described as "the unrelated-to-[the defendant]-by-blood-or-birth, ride-along friend." Ms. Ortiz was never charged, nor did she testify at the suppression hearing or trial.

in the floor of the vehicle, approximately, 11 bundles of suspected cocaine. It did field test positive for cocaine. And the gross total weight was 18.5 pounds." The cocaine was packaged in "gray duct tape." There was also "approximately [] 4 grams of marijuana in a sock, in [the defendant's] clothing, in his luggage."

Officer Marco Yzaguirre testified that while the defendant was seated in the backseat of the police car, the officer asked for and obtained the defendant's written consent to search the van. Yzaguirre said he explained to the defendant that he did not have to give consent to search and that this was a voluntary search.

Sergeant Michael McCord, a Memphis police officer assigned to the West Tennessee Drug Task Force, testified his canine partner, Jax, is certified and trained to detect various drugs, including cocaine. Jax makes an "aggressive indication" when he comes into contact with the smell of illegal drugs. McCord said when Jax encountered the defendant's van, "[h]e had an aggressive bark, almost, . . . all the way around the vehicle. And he actually indicated on the, . . . both driver and passenger side rocker panels. He actually went underneath the vehicle and tried to bite at the floor of the vehicle." After Jax indicated the presence of drugs, McCord assisted Jones and Yzaguirre in searching the van where they found the cocaine hidden "[i]n the floor of the vehicle" in an "after-market compartment" that was built into the van.

David McGriff, a supervisor with the West Tennessee Drug Task Force, interviewed the defendant following his arrest. After being readvised of his Miranda rights, the defendant gave a recorded statement to McGriff wherein he acknowledged placing more than seven kilos of cocaine wrapped in plastic wrap underneath the floor panel of his van to transport it from Las Vegas, Nevada, to Myrtle Beach, South Carolina. The defendant said he was to receive "[i]n the thousands of dollars" for transporting the cocaine. The defendant also told McGriff that his passenger, Ms. Ortiz, had no knowledge of the cocaine being in the van.

At the conclusion of the suppression hearing, the trial court issued oral findings from the bench. Based on the officer's smelling "burnt marijuana," the defendant's uncoerced consent, and the drug dog indicating drugs were present, the court found probable cause existed to search the defendant's van and denied the defendant's motion to suppress the cocaine. In addition, finding the defendant was advised of his rights and chose to make a statement to police "freely and voluntarily," the trial court denied the defendant's motion to suppress his statement.

**Trial**

Officers Jones, Yzaguirre, McCord, and McGriff testified again at the trial. Each basically gave the same testimony they offered at the suppression hearing. In addition, Tara Barker, a special agent forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory, testified that she tested a sample of the substance taken from the defendant's van and said it was "found to be cocaine, Schedule II."

The defendant did not testify at either the suppression hearing or at trial.

## ANALYSIS

### I. Defendant's Competency

On appeal, the defendant's sole argument is that "under the totality of circumstances, both [his] consent to search and confession were involuntary" because "circumstances combined to overwhelm [the defendant's] will to resist." Specifically, the defendant maintains that "his consent to search and statement of admission can not be deemed knowing and voluntary without a meaningful evaluation of his mental competency and/or mental illness." The State argues the defendant waived this issue for appeal because he failed, pursuant to Tennessee Rule of Appellate Procedure 36(a), to take any action to prevent the harmful effect of the alleged error by both failing to raise this issue before the trial court by asking for a competency hearing or in his motion for a new trial. We agree with the State.

The record on appeal includes transcripts of all the defendant's pretrial proceedings. These transcripts show an articulate but uncooperative defendant who insisted upon representing himself despite the trial court's numerous advisements against doing so. In response to the trial court's questions to determine if the defendant could in fact represent himself, the defendant either did not answer or said that "[he] would be happy to assist this Court in any way possible if he could just see [his] certificate of claim." In addition, the defendant made the following claims and requests: his name was not Michael Ortiz;[5] he was not a "Person" who was subject to the court's jurisdiction; the court should "dismiss this case for lack of evidence and failure to state a claim and want of jurisdiction;" he would accept a lawyer only if the lawyer would show him his license and "sign a contract to represent [him] zealously and rescind all contracts . . . with the State;" that the "flags [in the courtroom] get taken down immediately and have the United States peace flag brought in here with no yellow fringe around it;" and for the "prosecutor to provide serial placement number of their bar card." Early on in the proceedings, as a precaution, the trial court appointed a public defender to "sit as armchair counsel to assist" the defendant.

In November 2003, as a result of his actions and statements to the trial court during the pretrial proceedings, the defendant underwent a court-ordered mental evaluation at Memphis Mental Health Institute ("M.M.H.I.") to determine his competency to stand trial.[6] In a letter to the trial

---

[5] When asked by the court what his name was, the defendant simply answered "No, it's not."

[6] The defendant was initially evaluated at Midtown Mental Health Center. The forensic director who evaluated him informed the trial court that the defendant's "ability to confer with counsel and participate in his defense was questionable." He was then transferred to M.M.H.I. for further evaluation.

court,[7] M.M.H.I. noted that "it is the opinion of the staff that there are no known impediments that would preclude [the defendant] from adequately defending himself in a court of law" and, furthermore, the staff's "impression is [the defendant] is intentionally attempting to foil his case from progressing through the legal system by being uncooperative. His behaviors seems to be driven by secondary motives rather than mental illness."

On February 20, 2004, the defendant acknowledged to the trial court that he did "need counsel" and did not want to represent himself. The trial court immediately appointed the public defender to represent the defendant. In addition, on July 8, 2004, the trial court entered written findings of facts and conclusions of law detailing the events that led to the court's appointing the public defender's office to represent the defendant at his suppression hearing and trial:

> This cause came on to be heard upon the returning of an indictment charging the defendant with the Unlawful Possession of a Controlled Substance with the intent to Sell or Deliver on February 6, 2003. Upon arraignment, February 13, 2003, the defendant refused to answer the Court's questions about his ability to employ counsel. The defendant indicated he wanted to represent himself, however as the Court attempted to question the defendant about his understanding of the law regarding self representation he refused to answer the questions in a proper manner. Even though the defendant refused to answer questions he indicated that he wanted to represent himself and the Court agreed to allow him to represent himself at trial. On February 27, 2003, the Court designated the Public Defender's Office to assist the defendant in trial preparation. The defendant resisted any help. The case was set for trial for June 2003. The case involved a video taped arrest and search. The defendant was brought into court and allowed to watch the video as part of discovery. As a precaution the Court entered an order to have the defendant's competency determined. After examination the Doctors recommended further evaluations based on the defendant's actions. After a 30 day evaluation the Doctors concluded that the defendant was competent and that his actions and lack of cooperation were calculated and they recommended that his proceedings proceed. The case had to be reset for several months during this process and eventually in November, 2003, the matter was set for trial May 3, 2004. The Court had continually brought the defendant into Court to discuss the pitfalls of representing himself and to try to discourage such action. However, on each occasion the defendant continued with a litany of statements which had been prepared by the defendant and were read into the record by the defendant. The statements were non responsive and the demands were immaterial and improper as regards this criminal proceeding. The defendant continued on each occasion with

---

[7]Although the appellate record contains the letters to the trial court from both Midtown Mental Health Center and M.M.H.I., the letters are not marked as exhibits. However, the trial court discussed these mental evaluations in its July 8, 2004, findings of facts and conclusions of law. Therefore, this court determines that the letters, both of which are contained in a sealed envelope, are part of the appellate record. See State v. Bobadilla, — S.W.3d —, 2005 WL 3193823, at *3 (Tenn. 2005).

the same presentation and continuously filed pro se documents which had no bearing on this proceeding. On February 20, 2004, the defendant in one of his presentations advised the Court that he did not want to represent himself and that he did want an attorney, although as usual he had certain demands on that attorney which the Court would not grant. However, the Court at that point determined that the defendant was in need of legal assistance and that from that date forward the Public Defender would be handling the case and the defendant would no longer be allowed to represent himself. Since that date motions have been filed including a Motion to Suppress evidence which is set for a hearing in September and a new trial date has been set for November 1, 2004. The defendant continues to refuse to cooperate with counsel and refuses to recognize counsel without counsel complying with defendant's demands. The requirements are unrealistic and not required by law and will not be ordered by this Court. Therefore the Public Defender is proceeding without the help or cooperation of the defendant.

> "'The right to assistance of counsel in preparation and presentation of a defense to a criminal charge is grounded in both the Tennessee and the United States Constitutions.' (Neither of which the defendant recognizes as authority over him) State v. Northington, [667] S.W.2d 57, 60 (Tenn. 1984). An accused also possesses a right to self-representation, see State v. Gillespie, 898 S.W.2d 738, 740 (Tenn. Crim. App. 1994), but a 'strong presumption against waiver of the constitutional right to counsel' exists, Northington, 667 S.W.2d at 60. An accused's request for self-representation in a criminal proceeding must be timely, as well as clear and unequivocal. See State v. Herrod, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988). The defendant must know why 'he should have counsel and what he risks by refusing appointed counsel' and thus 'clearly understand the hazards of representing himself.' Further, 'the record must show that the defendant made his decision to waive counsel knowing the disadvantages and dangers of representing himself.' State v. Goodwin, 909 S.W.2d 35, 40-41 (Tenn. Crim. App. 1995). State v. Ruff, C.C.A. No. 02C01-9801-CR-00006 [, 1999 WL 281072 (Tenn. Crim. App.] May 7, 1999).

Included in the Ruff opinion is an Appendix citing United States v. McDowell, 814 F.2d 245, 254-52 (6th Cir. 1987) (quoting Guidelines for District Judges from (Bench Book for United States District Judges 1.02-2 to 5 (3d ed. 1986)). This court went over those exact questions and got non responsive answers from the defendant. As a result of questioning and listening to the defendant's presentations[,] this Court is not convinced that the defendant has clearly and unequivocally stated in writing or otherwise that he desires to represent himself or that he has the ability to do so. Further in light of recent cases by the Court of

Criminal Appeals regarding pro se litigants who act up in Court and are removed from the proceedings and left unrepresented if elbow counsel has hot been appointed, this Court concluded early on that the defendant needed elbow counsel. The defendant has stated that he refuses to recognize the Public Defender as his counsel and has refused to cooperate with his defense, as a result the Court is not convinced that the defendant would act properly in the Trial of his cause and as a result could be removed from the proceedings. Although the defendant has not shown disrespect for nor been disruptive in the [c]ourtroom his actions although civil could be disruptive to trial proceedings. This Court is satisfied that the Public Defender will be prepared to handle the Motion to Suppress and if necessary the Trial of this cause with or without the assistance of the defendant. This Court fully recognizes the defendant's right to think as he pleases with regard to the United States and Tennessee Constitution and the authority of this Court to have jurisdiction over him, however the Court has taken an oath to uphold those Constitutions and included therein are the rights to representation or self representation.

This Court is not satisfied that the defendant has made a clear and unequivocal waiver of his right to representation and therefore the Court will Order that the defendant will not be allowed to represent himself and the case will proceed with appointed counsel.

On appeal, the defendant argues that "the M.M.H.I. report is frighteningly inept and a real abuse of State funds meant to assist the court in making a determination of a defendant's competency." The defendant, however, neither asked for a competency hearing nor raised any complaint about the M.M.H.I. mental evaluation in his motion for a new trial. Accordingly, we agree with the State that the defendant has waived this issue. See State v. Estes, 655 S.W.2d 179, 182 (Tenn. Crim. App. 1983) (holding that although a court-ordered mental evaluation of the defendant was conducted, trial counsel's failure to seek a competency hearing "to insure that the matter of competency was settled before trial amounted to a waiver of that issue" under Tennessee Rule of Appellate Procedure 36(a)); Tenn. R. App. P. 3(e) (providing that "no issue . . . shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial").

In addition, even if we had not found this issue to be waived, there is no proof in the record that the M.M.H.I. report is inaccurate. The trial court relied on the M.M.H.I report to conclude that the defendant was competent to stand trial. The defendant is now asking us to find the report insufficient on its face. There is no basis in the record for us to make such findings, and we decline to do so. As we explained in State v. Treva Dianne Green, No. E1999-02204-CCA-R3-CD, 2000 WL 1839130, at *3 (Tenn. Crim. App. Dec. 14, 2000), perm. to appeal denied (Tenn. May 21, 2001), "[w]itness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); Liakas v. State, 199 Tenn. 298,

305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the court is not an appellate surrogate for the trier of fact."

## II.  Motions to Suppress

As discussed above, the defendant's sole argument on appeal is that he lacked the mental capacity to consent to the search of his van and give a knowing and voluntary confession.  As we have determined that this issue is without merit, we conclude that the trial court properly denied both motions.

## <u>CONCLUSION</u>

Based on the forgoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE