IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 26, 2019 Session

## STATE OF TENNESSEE v. KAREN SARAH THOMAS, ALIAS

**Appeal from the Criminal Court for Knox County**
**No. 108788     Steven W. Sword, Judge**

_____

### No. E2018-00353-CCA-R3-CD

_____

The Defendant, Karen Sarah Thomas, alias, appeals her jury convictions for aggravated stalking. In this direct appeal, the Defendant alleges that the evidence was insufficient to support her convictions and that the trial court erred when it allowed the State to introduce evidence of an out-of-courtroom event that took place during the trial. Following our review of the record and the applicable authorities, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mark E. Stephens, District Public Defender, and Jonathan Harwell, Assistant District Public Defender (on appeal); and Charles G. Currier (at trial), Knoxville, Tennessee, for the appellant, Karen Sarah Thomas, alias.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Willie R. Lane and Randall J. Kilby, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

This case involves an underlying feud between two families—the Defendant's and the victim's. On August 17, 2016, a Knox County grand jury charged the Defendant with alternative counts of aggravated stalking. See Tenn. Code Ann. § 39-17-315. The Defendant was alleged to have "unlawfully and intentionally stalk[ed]" the victim, A.D.,[1]

---

[1] It is the policy of this court to refer to minor victims by their initials to protect their identity.

between February 18, 2016 and May 2, 2016. Count 1 charged that the Defendant was prohibited from making contact with the victim by an order of protection and that the Defendant knowingly violated the order. Count 2 charged that the victim was less than eighteen years of age at the time while the Defendant was at least five years older than the victim. The Defendant proceeded to a jury trial in February 2017.

The victim testified that she grew up in Florida and moved to Knoxville with her mother, father, and two brothers in July 2015 when she was fourteen years old. They moved into the Defendant's home and resided with the Defendant and her family. The families had previously interacted with each other when both families lived in Florida. Once in Knoxville, the victim and the Defendant's teenage daughter both attended West Valley Middle School. When the two families began to quarrel, the victim and her family moved out in October 2015.

In late 2015, the Defendant had exchanged angry text messages with the victim's mother, including messages discussing the victim. The Defendant sent the following text message to the victim's mother:

> If I wanted to harass you, think of all the ways, with the skills and technology that I have available to me, that I could. Then consider the fact that, by your own admission, your daughter cannot be trusted and creates drama and is slick enough to fool a psychiatrist. Then consider that she's not f--king with me. She's f--king with my children. Then realize I have done nothing to mess with you. If I want to f--k your life, I would walk away from the space forward, your non intention to pay whole Rob so that they could go after you and garnish your husband's wages.

The Defendant sent another message to the victim's mother stating, "In case I haven't made it clear enough, everyone in my family f--king hates your daughter and thinks she's a b---h and a w--re, and so do all of [my daughter's] friends."

> The Defendant further said to the victim's mother, via text message,

> F--k everyone and everything, and then all the s--t is f--king up my kids' Thanksgiving and f--king up the first day I've had to spend with them in forever. So I either need you to come over here like in five minutes, or I'm going to go over there and tak[e] a turn ruining your family's Thanksgiving.

The Defendant texted, "We will have somebody f--k with [the victim's brother] at school all day long and then try to break up every friendship he has." The Defendant continued that, if she did not "get enough satisfaction from that," she would accuse the victim's

-2-

other male family members of raping the Defendant's daughter and have someone "start physically hurting" the victim's brother.

There was a short but direct confrontation between the Defendant and the victim before the order of protection went into effect, and the confrontation was recorded. On this occasion, the victim was accompanied by a friend, and the Defendant was "right next to" the victim when the conflict occurred. The recording captured the Defendant saying to the victim, "You know, I'm not allowed to talk to lying w--res, but I can talk about lying w--res that accuse people of raping them." She also said, "Oh, of course I'm talking about you. You should know." Furthermore, the Defendant remarked, "Do your friends know what you say about them behind their backs?" to which the victim responded, "I'm sure they do. Thank you." The recording was played for the jury.

The victim indicated that there were "other instances" during this time that the Defendant called her names. When asked if the Defendant made "other threatening statements" to the victim, the victim replied, "She told me that she would make my life a living hell, and I told her that she already did, and she said she could do worse."

As a result, the victim's mother obtained an order of protection against the Defendant on behalf of the victim. The February 18, 2016 order of protection was entered as an exhibit at trial. The victim was listed as the "Petitioner/Plaintiff," and it was noted that the order was sought by the victim's mother for the "minor plaintiff." The order of protection, which indicated that it was issued "after proof," forbid the Defendant from "abus[ing] or threaten[ing] to abuse Petitioner or Petitioner's minor children" and from "stalk[ing] or threaten[ing] to stalk Petitioner or Petitioner's minor children." The order also instructed the Defendant not to "come about the Petitioner (including coming by or to a shared residence) for any purpose" and not to "contact Petitioner and Petitioner's children, either directly or indirectly, by phone, email messages, text messages, mail or any type of communication or contact." It also required the Defendant to stay away from the Petitioner's home and workplace and the "children's home and workplace." The portion of the order for "particularized findings of fact that the [Defendant] committed the following acts" was left blank. The order was placed into effect until February 17, 2017. Many of the additional details not recounted above that ultimately led to this order of protection were excluded by the trial court because the trial court did not want the trial turning into the "Jerry Springer Show."

The victim testified that, following entry of the protection order, her mother would pick her up when she got out of school at 3:30 p.m. The victim stated that her mother parked "by the sidewalk, right next to the entrance of" the school. The victim had to walk up a hill to reach her mother, and it was customary for the children to walk with their friends.

When the victim was asked to describe "the next time" she saw the Defendant after the protection order was entered, the victim replied, "[S]he was parked right in front of my mom." According to the victim, the Defendant "would purposely park right in front of [her] mom, and [she] would have to walk past her in order to get to [her] mom's car." The victim said that she could see the Defendant looking at her from inside the car, and the Defendant "gave [her] dirty looks." The victim described several instances where this occurred and maintained that the Defendant's actions made her feel "terrified." The victim subsequently explained that this happened almost "every day" and that she was afraid and "very uncomfortable" every time she had to walk past the Defendant.

The victim recounted a specific incident that took place on February 26, 2016. According to the victim, after she got into the car with her mother that day and they were headed home, the Defendant "started driving behind [them], and she would speed up." The victim claimed that there was another route for the Defendant to take.

The victim also described an April 5, 2016 incident that occurred following her release from Peninsula psychiatric hospital. Although the victim was not at school that day, the victim went to the pick-up area "to surprise [her] best friend" that she had just been released. When her best friend "got up the hill[,]" the victim got out of her car to give her friend a hug. The victim testified that, as she "looked back," she saw the Defendant with her friend "Tracy" "leaning against Tracy's red van looking at [her]." At that time, the victim and her friend took a picture of the Defendant's leaning on the van "staring" at the victim. The victim described the Defendant's look in the photograph: "I know her looks, and the look that she was giving me made me feel uncomfortable." The victim acknowledged that she was about two-car lengths from the Defendant when this took place and that she was "walking away" from the Defendant at the time the picture was taken.

The victim relayed that, on March 23, 2016, the Defendant took a picture of her and that she had seen that picture. The Defendant's behavior caused her to feel afraid.

On April 8, 2016, the victim's mother took a video reflecting that the Defendant "got out of her car at the school and was walking toward the hill." The victim testified her mother called her while she was inside the school and "told [her] to hold up because [the Defendant] was walking in [her] direction." The victim indicated that she had seen the recording and that her mother had filed a police report.

The victim was aware of an April 11, 2016 incident at school that caused her to be afraid. On that occasion, the Defendant "parked in front of the police officer at the school. [The victim's] mother pulled in behind . . . . The officer told [the Defendant] she had to go to another location to pick up her children."

The victim recalled that she saw the Defendant in her car on April 12, 2016. According to the victim, on that day, the Defendant "parked in a gravel area, and the police officer had to tell her to move, because she was in eyeshot of [the victim]."

The victim indicated that, every time she encountered the Defendant, she had "a really bad feeling," and she "thought [the Defendant] was just never going to stop until something bad happened." The victim explained, "I was afraid that she wouldn't stop torturing me until . . . I killed myself." The victim relayed that her Peninsula hospital stay lasted "almost a week" and that she was there due to "self-harming" by cutting herself. Although the victim had engaged in this behavior when she lived in Florida, the victim claimed that it had stopped prior to her move to Knoxville. According to the victim, it was the Defendant's behavior that led her to start cutting herself again. The victim indicated that following the April 5, 2016 incident, she "express[ed] [her] fear" to herself "in [her] room." The victim further testified that the Defendant knew about her prior history with self-harming. Moreover, the victim said that she was fearful of the Defendant while the victim was testifying at trial.

David Claxton, the principal at West Valley Middle School, testified that he spoke with the Defendant's husband in early April 2016. According to Principal Claxton, the Defendant's husband came to his office to talk about "the situation involving" his daughter and the victim. Principal Claxton recalled that "there was an issue of where the parents were picking up the children." Principal Claxton told the Defendant's husband, who was "upset," that he and his wife could park in the staff lot behind the school to pick up their daughter "to avoid any contact" with the victim. He also remembered the Defendant's husband referencing his "medical condition" when requesting this change. Principal Claxton relayed that the staff lot was "at the rear of the school" and was not as far away as where they had been picking up their daughter on the street in front of the school.

According to Principal Claxton, shortly thereafter, the Defendant and her husband came to his office, and the Defendant asked why her daughter "would need to change her normal pattern." Principal Claxton explained to the Defendant that he "was just trying to help." He believed that the Defendant did not "like the offer" to park in the rear of the school because her daughter liked walking up the hill with her friends to where they get into their cars. He clarified that this was not "an order" to the Defendant.

Principal Claxton also noted that he had taken other steps to keep the two girls separated while at school. For example, he had arranged to have a class exit through a different hall to prevent the girls from coming into contact with one another.

Officer Gary Frazier of the Knox County Sheriff's Office testified that, in April 2016, he was working at West Valley Middle School. On April 11, 2016, Officer Frazier

initiated a conversation with the Defendant after seeing her park behind the victim's mother. Officer Frazier was aware of the order of protection being in place, so he explained to the Defendant that she could not park there. Officer Frazier advised the Defendant to pick up her daughter behind the school in the area where Principal Claxton had given her permission to park. Officer Frazier indicated that the Defendant's daughter could walk out of the rear entrance of the school and get into the car and that they could then leave using the bus entrance. According to Officer Frazier, the Defendant "was a little upset" by their conversation, and she "had a little attitude" because she "didn't feel like she needed to leave." Officer Frazier described that the Defendant "just sort of sped off." He was unsure where the Defendant went that day.

The following day, the Defendant returned to the same area and parked in front of Officer Frazier. Officer Frazier then contacted a detective, who after speaking with the judge who issued the order of protection, instructed Officer Frazier to again tell the Defendant that she could not be present there and advise her to park behind the school. Officer Frazier went and spoke with the Defendant. He relayed the judge's instruction to the Defendant to park behind the school, but the Defendant responded that she was not going to interrupt her daughter's routine "for whatever." Officer Frazier warned the Defendant that he would have to arrest her if the victim approached. Officer Frazier saw her "pull down again," but he did not "catch her leaving."

Thereafter, Officer Frazier executed a warrant for the Defendant's arrest on May 5, 2016. After the Defendant dropped her daughter off at school, Officer Frazier, who was accompanied by another officer, pulled the Defendant over as she was leaving. Both officers approached the Defendant, and Officer Frazier told the Defendant to get out of her car because he had a warrant for her arrest. After a bit of coaxing, the Defendant complied, and he placed her in handcuffs and put her in the back of his police car. Officer Frazier testified that the Defendant seemed to think it was a "joke." According to Officer Frazier, the Defendant complained that she was bored and asked for a book to read. She also asked Officer Frazier to use her phone to take a photograph of her being transferred "to the transportation wagon[.]" Officer Frazier declined both requests.

Officer Frazier described the school campus and indicated that there were several other areas for the Defendant to park to pick up her daughter instead of at the "top of the hill" where she was parking. Officer Frazier explained that the lot behind the school where the Defendant had been given permission to park was about seventy steps from the back entrance, whereas the top-of-the-hill area was about 500 steps from the front entrance. Officer Frazier confirmed that there was also a crossing guard present during pick-up time.

Detective Tammy Brummit of the Knox County Sheriff's Office was the lead investigator in this case. She testified that, on December 14, 2015, she began an

investigation into the Defendant for stalking allegations and that she remained the lead investigator through the time of the Defendant's arrest on May 5, 2016. During her investigation, Detective Brummit interviewed the Defendant. The Defendant waived her Miranda rights and agreed to provide her side of the story.

The Defendant provided Detective Brummit with several names during the interview, claiming that those individuals would support her claims about the victim's family. The Defendant insisted, "I have never done anything to this child except for call her a b---h." When Detective Brummit indicated that she had reviewed the recording in which the Defendant called the victim "a w--re," the Defendant replied, "Okay, I might have called her a w--re." The Defendant confirmed that she said to the victim's mother, "You f--cked up my life, I'm going to f--k yours." The Defendant further agreed that she had told the victim's mother that if she wanted to mess up her life, she could do so. The Defendant indicated that, although she listed actions she could take, like disseminating naked pictures of the couple, she did not follow through with any of those. The Defendant claimed that the messages she had sent were all taken out of context and that they had been altered. Also during the interview, the Defendant refused to turn over her cellphone for a search despite being told that the victim's mother had done so.

While speaking with Detective Brummit, the Defendant asserted that she and her family were the ones that had been victimized. The Defendant claimed that her daughter did not want to be picked up at another location and showed Detective Brummit a text message from her daughter to that effect. The Defendant adamantly believed that the order of protection did not prohibit her from being on school property to pick up her daughter. She asserted that the trial judge that issued the protection order told her that it was not a problem as long as everyone stayed in their cars. She said that, if the families believed she was not allowed to be in the pick-up area, she would have been in trouble sooner because she parked there every day following entry of the order.

The Defendant spent several minutes during the interview explaining why she found the school bus procedure and schedule at her daughter's school to be untenable. The Defendant indicated that she would stand up for her daughter's right not to have to change her routine any more than she had already had to do so. However, she claimed that she asked for an alternate pick-up spot.

The Defendant mentioned during the interview that she had tried to obtain several orders of protection for herself and her family in regards to the feud between the two families. She claimed that it was only when she threatened to file a restraining order herself that the victim and the victim's mother sought an order of protection against her.

At trial, Detective Brummit further confirmed that the victim's mother had in fact agreed to a search of her cellphone. She further confirmed that the Defendant was never successful in obtaining any orders of protection against the victim or her family.

Detective Brummit testified that she had spoken with school officials at the girls' middle school while investigating these allegations. She was informed that the Defendant "had inquired with the school about a bullying situation[.]" However, according to Detective Brummit, school officials told her that "[t]hey went back and reviewed their video" and that "they found no instance" of bullying occurred.

Detective Brummit confirmed that she had not spoken to any of those persons that the Defendant listed during her interview, reasoning that they were located out of state and that they did not "have anything to do with [the] investigation as to whether" the Defendant would leave the victim alone during the relevant time period. Detective Brummit acquiesced that she also had not spoken with the crossing guard.

The Defendant called former West Valley Middle School principal Renee Kelly, who testified that she was aware of problems between the victim and the Defendant's daughter "prior to winter break" in 2015. However, in February 2016, Ms. Kelly left the middle school for another job.

Based upon her conversations with the Defendant, Ms. Kelly believed that the Defendant was trying with the victim's mother to resolve the situation. Ms. Kelly recalled that both of girls were "good kids" and were not "troublemakers." Ms. Kelly averred that she had not witnessed the Defendant "handle[] anything in an aggressive or stalking manner." Ms. Kelly further stated that the Defendant dealt with other children in a friendly and respectful manner, and she did not believe that the Defendant was "inclined to stalk or otherwise terrify" students at the school.

When asked about the traffic patterns of parents picking up their children, Ms. Kelly indicated that, if the need arose, it was "not very difficult" for the school to accommodate a parent's picking up his or her child at the rear bus entrance. She also concluded that it would not be challenging to re-route a student in a different direction inside the school if only two classes were involved.

Lee Ann Wright was a teacher at Bearden High School who had taught the Defendant's daughter. Ms. Wright opined that the Defendant was "an extremely insightful person when it c[ame] to her children," and she wished more families communicated at the same level. Ms. Wright stated that she had not had any interactions with the Defendant or the Defendant's daughter that would lead her to believe that they would behave aggressively towards other students. However, Ms. Wright noted that she

had only interacted with the Defendant through telephone calls and that she had never had any dealings with the victim.

Sarah Roberts, a crossing guard at West Valley Middle School, testified that she knew the Defendant because she had spoken with her once and had seen her picking up her daughter from school. Ms. Roberts described several areas around the school where parents picked up their children. Ms. Roberts indicated that she was not given any special instructions by the school regarding the Defendant. Ms. Roberts had not observed "anything [the Defendant] might have done" aside from parking and picking up her daughter "at the top of the school." Ms. Roberts maintained that, during that school year, the victim's mother routinely parked in the same spot where the victim met her after school.

On one occasion, the police were called, and Ms. Roberts saw the police speak with the victim's mother. The Defendant was not present at that time. Ms. Roberts indicated that none of her interactions with the Defendant reflected "badly" on the Defendant's character.

The Defendant testified and adamantly denied stalking the victim. She stated that she never phoned the victim or "saw [the victim] anywhere, never went to her house, never went to her Instagram page or her Facebook page."

The Defendant claimed that she did not understand the "order of procedures" and that she "was not able to speak or present evidence" at the February 18, 2016 hearing when the order of protection was entered. The Defendant averred that she made a mistake by not obtaining an attorney for that hearing. When asked whether she did what "they" accused her of doing, the Defendant responded, "That is not a simple question[.]" The Defendant discussed her history with the victim's family and described hosting the family as "intolerable." The Defendant was forty-four years of age at the time the order of protection was entered.

The Defendant maintained that the victim "had threatened to gather her friends and cause harm" to the Defendant's daughter. The Defendant explained that she informed the school and the victim's mother. The Defendant asserted that she called the police and "went to the juvenile department of justice."

The Defendant identified the photograph of her and Tracy Walker's standing outside of Ms. Walker's vehicle on April 5, 2016. The Defendant claimed that she was informed that the victim was not in school that day and that she would have returned to her car if she had been aware that the victim was present. The Defendant asserted that it was her "intention to comply with the order" and that she "did not understand the actual context of the no-contact order[] and what it entailed until the police officer explained it

to [her] on April 11th." The Defendant maintained that she had picked her daughter up at that location for the past two and one-half years. She averred that it was the victim's mother who changed her parking location and started parking at the top of the hill "beginning the day of the order."

The Defendant claimed that the orders of protection she sought against the victim and her family "were not heard due to orders of procedure." She indicated that she was never allowed to present any evidence in that regard. In addition, the Defendant volunteered that the court found her in contempt for violating the order of protection due to the incident portrayed in the April 5, 2016 photograph, but the Defendant asserted that "most of" the thirty-eight alleged violations of the protection order were dismissed. She acknowledged that the court gave her a ten-day suspended sentence for violating the order. However, the Defendant maintained that, despite the sentence, the judge told her that she "acted in accordance with the spirit of the order and that [she] testified honestly and truthfully."

The Defendant asserted that Principal Claxton had, at her husband's request, offered to allow her husband to park behind the school due to his health conditions and because "the behavior of the alleged victim's mother towards him was aggressive at pick-up time." The Defendant asserted that the original offer was made to her husband, but she conceded that Principal Claxton later extended the offer to her as well. The Defendant insisted that she rejected the offer "for reasons of [her] daughter's safety." The Defendant later stated that she rejected the offer because she did not want to change her daughter's routine.

The Defendant conceded that she called the victim a "b---h." The Defendant did not recall calling the victim a "w--re," although she acknowledged that she told Detective Brummit that she may have referred to the victim as "w--re." However, the Defendant asserted that she would not "generally" refer to a child by such a name. She claimed that the audio recording of the confrontation between her and the victim was unclear and could be "interpreted in different ways by different people." The Defendant agreed that it was her voice on the recording.

The Defendant acknowledged sending the various text messages to the victim's mother. According to the Defendant, she wanted the victim's mother to leave her alone, but she would not. Moreover, the Defendant insisted that the messages could only be perceived as threats if taken out of context and noted that she sent them before the order of protection was in place.

The Defendant alleged that, after Officer Frazier spoke to her on April 11 about parking near the victim, she parked "in a different place" and "a completely separate

-10-

area." The Defendant claimed that she did not tell Officer Frazier that she refused to change her habits. According to the Defendant, she told Officer Frazier,

> [M]y daughter has made it very clear that she no longer wishes to have to change her behavior when she has done nothing wrong in order to avoid the person who is doing something wrong to her, that she has decided to stand her grounds, and that I support that.

The Defendant denied returning to the same spot the next day and insisted that she had moved at the officer's request. The Defendant said that the crossing guard invited her to "park across the street and down the hill a little bit in the gravel area." She maintained that she sent an email to "the officers" and Principal Claxton asking if that would be a suitable alternative to parking behind the school. According to the Defendant, she received "no timely response." The Defendant insisted that she made "alternative arrangements," which allowed her daughter to still walk up the hill with her friends. In addition, the Defendant explained that the bus schedule made it impracticable for her daughter to ride the bus.

Tracy Walker testified that she was the person standing with the Defendant in the photograph taken outside West Valley Middle School on April 5, 2016. Ms. Walker indicated that, at one time, she, the Defendant, and the victim's mother had all been friends, and they would often "hang[] out" together as they waited for their daughters to come out of school. Ms. Walker noted that it was normal for them to stand outside on nice days while waiting to pick up their children. She explained that the mothers would "park up at the top of the hill" to avoid "get[ting] trapped" in traffic down the hill closer to the school. Ms. Walker maintained that three of them did this together for "months" prior to the problems that arose between the two families.

Ms. Walker was aware that an order of protection was entered. Ms. Walker recalled that she did not see any change in the Defendant's behavior after the problems arose, noting that the Defendant appeared to park in the same location and that the victim would frequently have to walk past this location. However, Ms. Walker also stated that the Defendant "did start parking back away from everything." Ms. Walker indicated that the victim's mother's parking location "[s]ort of" changed. Ms. Walker testified that the Defendant informed her at some point that the Defendant "was supposed to park down by the . . . back of the school."

According to Ms. Walker, she did not see anything that led her to believe that the Defendant "was attempting to stalk or do anything to" the victim. Ms. Walker asserted that the Defendant never seemed to be "trying to insert herself into the proximity of" the victim and that she had not seen the Defendant act aggressively towards the victim.

-11-

In rebuttal, the State called the victim to testify about an event that occurred outside of the courtroom during the lunch recess. The victim testified that, during the recess, she went outside with her father and Detective Brummit to the "benches and stuff." The victim described this area as "on this side of the court" and "kind of like a catwalk." According to the victim, her father and Detective Brummit began talking while she ate her lunch. When Detective Brummit went back "inside to go get something to eat," the Defendant walked outside. The victim explained that, at that time, she and her father "were in the middle of the catwalk" taking pictures of "the buildings and stuff[.]" According to the victim, the Defendant came and stood near them, which was "too close for [the victim's] comfort." The victim said that the Defendant "looked at" her and then started speaking with Ms. Wright. The victim and her father then went back inside to finish eating lunch.

On cross-examination, defense counsel had the victim draw a diagram of the "catwalk" area and the encounter. According to the victim, the Defendant and Ms. Wright were close enough for the victim to hear their voices, but she could "not hear what they were talking about." The victim agreed that the Defendant was not "trying to project her voice" so that the victim could hear it.

The Defendant testified on surrebuttal about the out-of-courtroom incident. The Defendant stated that she "intercepted [her] son in the hallway as he was heading towards the cafeteria[,]" and she "gave him [her] debit card to purchase some lunch." At that time, the Defendant saw Ms. Wright sitting outside, so she went outside to join her. According to the Defendant, Ms. Wright "pointed out to [her]" that the victim and her father were also outside. She claimed that she did not see them prior to joining Ms. Wright. The Defendant indicated that "there was nothing [she] could do at that point" because the victim and her father "were walking further away towards the other side of the catwalk[.]" The Defendant asserted that, because they "were walking away in the opposite direction," she "didn't consider it to be an issue." The Defendant also drew a map of area, including the parties respective locations.

In addition, the Defendant called Lee Ann Wright back to the stand, who also mapped out the scene. Ms. Wright said that she was standing outside in the smoking area during the recess when the Defendant "walked straight" from the door to where Ms. Wright was located. According to Ms. Wright, the victim walked across the "breezeway" to "stand on the same side" as the two women and used her cellphone to take a picture "down on the road." Ms. Wright maintained that the Defendant did not "indicate any recognition" of the presence of the victim or the victim's father. Ms. Wright claimed that the Defendant did not "make any hostile moves towards them," that the Defendant did not "say anything to them," and that the Defendant did not make any "loud expressions of

any kind." Ms. Wright described that she and the Defendant "were just having a conversation between the two of [them]."

Following the conclusion of the proof, the jury found the Defendant guilty as charged on both counts. Thereafter, the trial court merged the two counts and sentenced the Defendant, a Range I, standard offender, to two years of split confinement. Specifically, the trial court ordered the Defendant to serve one year in the local jail before being released on supervised probation. Because this court has seen similar sentences recently, we feel constrained to observe certain release eligibility requirements.

Tennessee Code Annotated section 40-35-501 governs release eligibility for imprisoned offenders. Section 40-35-501(a)(3) defines what is known as determinate release: "Notwithstanding any other law, inmates with felony sentences of two (2) years or less shall have the remainder of their sentence suspended upon reaching their release eligibility date." This court has consistently interpreted Tennessee Code Annotated section 40-35-501(a)(3) to mean that a trial court cannot initially sentence a defendant with a felony sentence of two years or less to a longer period of confinement than their release eligibility date. See State v. Gary M. Carter, No. M2006-02341-CCA-R3-CD, 2008 WL 544629, at *4 (Tenn. Crim. App. Feb. 21, 2008); State v. Kristi Dance Oakes, No. E2006-01795-CCA-R3-CD, 2007 WL 2792934, at *12 (Tenn. Crim. App. Sept. 27, 2007); State v. Henry Marshall, Jr., No. W1999-01159-CCA-R3-CD, 2001 WL 91950, at *6 (Tenn. Crim. App. Jan. 26, 2001); State v. John W. Hill, No. 01C01-9802-CC-00072, 1999 WL 92948, at *1-2 (Tenn. Crim. App. Feb. 25, 1999). Accordingly, when a felony sentence is two years, determinate release for a Range I, standard offender is 7.2 months less certain sentence credits. See State v. Glynnon Bradshaw, No. 01C01-9810-CR-00439, 1999 WL 737871, at *2 (Tenn. Crim. App. Sept. 22, 1999).

In this case, the trial court indicated that the determinate release provision did not apply given that the Defendant was sentenced to one year in the county jail rather than the Tennessee Department of Correction ("TDOC"). However, this section applies regardless of whether the offender is sentenced to the local jail or the TDOC. See Tenn. Code Ann. § 40-35-501(a)(1) ("A felony sentence to the department of correction or to a local jail or workhouse shall be served according to this chapter."). See, e.g., Oakes, 2007 WL 2792934, at *12; Marshall, 2001 WL 91950, at *6; Hill, 1999 WL 92948, at *1-2. Accordingly, the Defendant's period of one-year incarceration breached the dictate of section 40-35-501(a)(3). Nonetheless, we glean from the record that the Defendant's appeal bond was revoked and that the Defendant has therefore served any period of incarceration in its entirety. Accordingly, the issue is moot.

The Defendant's timely motion for new trial was denied. Her appeal, wherein she challenges the sufficiency of the evidence and the admission of testimony regarding the out-of-courtroom incident, is properly before this court.

-13-

## ANALYSIS

On appeal, the Defendant argues that the evidence was insufficient to support her aggravated stalking convictions. Specifically, she alleges that her conduct of sitting in her car in a pick-up area, "directing 'dirty looks' at [the victim], and standing near [the victim] on one occasion when [the victim] was unexpectedly [present at] school, [was] not enough . . . to cause a reasonable person to be frightened or terrorized or suffer emotional distress, as required by statute." She further contends that the State failed to prove "there was no legitimate purpose for [her] conduct in picking up her daughter" at school. The State responds that the evidence was sufficient because a reasonable fourteen-year-old girl "in the victim's circumstances would suffer emotional distress or feel terrorized, frightened, intimidated, threatened, harassed, or molested by the [D]efendant's actions." The State additionally asserts that, "while the [D]efendant perhaps had a legitimate purpose for being in the general area of the school, this purpose did not extend to the specific area she chose to occupy daily near the victim."

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

It is criminal offense to engage in stalking. Tenn. Code Ann. § 39-17-315(b)(1). Stalking is defined as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized,

frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]" Tenn. Code Ann. § 39-17-315(a)(4).

The statute also delineates several terms used in the definition of stalking. The statutory term "'course of conduct' means a pattern of conduct composed of a series of two or more separate, noncontinuous acts evidencing a continuity of purpose[.]" Tenn. Code Ann. § 39-17-315(a)(1). The statute defines "harassment" as

> conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose[.]

Tenn. Code Ann. § 39-17-315(a)(3). "'Unconsented contact' means any contact with another person that is initiated or continued without that person's consent, or in disregard of that person's expressed desire that the contact be avoided or discontinued." Tenn. Code Ann. § 39-17-315(a)(5). Unconsented contact includes, but is not limited to, any of the following:

> (A) Following or appearing within the sight of that person; (B) Approaching or confronting that person in a public place or on private property; (C) Appearing at that person's workplace or residence; (D) Entering onto or remaining on property owned, leased, or occupied by that person; (E) Contacting that person by telephone; (F) Sending mail or electronic communications to that person; or (G) Placing an object on, or delivering an object to, property owned, leased, or occupied by that person[.]

Tenn. Code Ann. § 39-17-315(a)(5). Furthermore, the statutory term "emotional distress" is "significant mental suffering or distress." Tenn. Code Ann. § 39-17-315(a)(2). Emotional distress may, but does not necessarily, require medical or other professional treatment or counseling. Tenn. Code Ann. § 39-17-315(a)(2).

Thus, assembling the various elements of this statute, to sustain a conviction for stalking, the State's evidence must demonstrate beyond a reasonable doubt that a defendant engaged in (1) a willful course of conduct; (2) involving repeated or continuing harassment of another individual, including, but not limited to, repeated or continuing unconsented contact; (3) that would cause a reasonable person to suffer emotional distress and that actually caused the victim to suffer emotional distress; and (4) that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened,

harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested. See State v. Flowers, 512 S.W.3d 161, 165-66 (Tenn. 2016) (citation omitted). Moreover, we note that,

> [i]n a prosecution for a violation of this section, evidence that the defendant continued to engage in a course of conduct involving repeated unconsented contact with the victim after having been requested by the victim to discontinue the conduct or a different form of unconsented contact, and to refrain from any further unconsented contact with the victim, is prima facie evidence that the continuation of the course of conduct caused the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

Tenn. Code Ann. § 39-17-315(f).

As relevant here, for the offense to be elevated to aggravated stalking, the State had to prove either (1) that the victim was less than eighteen years of age at any time during the Defendant's course of conduct and that the Defendant was five or more years older than the victim, or (2) that the Defendant was prohibited from contacting the victim by an order of protection and that the Defendant knowingly violated the order. See Tenn. Code Ann. § 39-17-315(c)(1)(B), (E). Aggravated stalking is a Class E felony. Tenn. Code Ann. § 39-17-315(c)(2).

The Defendant focuses much of her initial and reply brief on the appropriate reasonable person standard to be applied. Before we consider whether the evidence presented at trial supported a finding that these elements were proven, we must determine what standard to apply in determining whether a reasonable person would have suffered emotional distress and would have felt terrorized, frightened, intimidated, threatened, harassed, or molested. We can find no Tennessee case that specifically addresses this issue in the context of the stalking statute when dealing with a child victim.

We are guided by J.D.B. v. North Carolina, in which the United States Supreme Court held that a child's age must be considered as a factor in determining whether the child was in custody for Miranda purposes. 564 U.S. 261, 277 (2011). In reaching this conclusion, the Supreme Court reasoned that, "even where a 'reasonable person' standard otherwise applies, the common law has reflected the reality that children are not adults." Id. at 274. "A child's age is far 'more than a chronological fact.'" Id. at 272 (quoting Eddings v. Oklahoma, 455 U.S. 104, 115 (1982)). Instead, "[i]t is a fact that 'generates commonsense conclusions about behavior and perception.'" Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 674 (2004)). Likewise, we recognize this reality in the context of a child stalking victim.

-16-

We note too that a child's age is considered in other contexts. See, e.g., Swix v. Daisy Mfg. Co., 373 F.3d 678, 686-87 (6th Cir. 2004) (applying reasonable-child standard in a products-liability case); Glen A. Puryear ex rel. Adolphus Puryear, Jr., et al. v. John Stuart, et al., No.70, 1990 WL 38348, at *1-2 (Tenn. Ct. App. Apr. 6, 1990) (determining, in a personal injury action, that the minor "defendant's failure to ascertain whether [the] plaintiff was in a place of safety created a question for the jury, taking into account [the] defendant's age, ability, intelligence, training and experience"). Accordingly, we conclude that, when dealing with a juvenile victim of alleged stalking, the jury should view the circumstances from the standpoint of a reasonable child of the victim's age, not a reasonable adult. See, e.g., C.M. for and on behalf of A.M. v. McKee, 398 P.3d 228, 232 (Kan. App. Ct. 2017) (analyzing the Kansas stalking statute and concluding that, for an eleven-year-old plaintiff, the issue of "whether a reasonable person would have feared for his or her safety or suffered substantial emotional distress" was to be considered from the standpoint of a reasonable child, not a reasonable adult). We cannot refuse redress to a child victim simply because a reasonable adult would not have suffered emotional distress and would not have felt terrorized, frightened, intimidated, threatened, harassed, or molested in the same situation. See id.

As charged in the indictment, the relevant time period for the Defendant's conduct was February 18 to May 2, 2016. This time period was after an order of protection had been entered forbidding the Defendant to "come about the [victim] for any purpose" or to "contact [the victim], . . . either directly or indirectly, by phone, email messages, text messages, mail or any type of communication or contact." We note that many of the details leading to this order of protection were excluded by the trial court because the trial court did not want the trial turning into the "Jerry Springer Show." However, the details that were admitted about the events leading up to entry of the order of protection were certainly relevant to establish the reasonableness of the victim's fear.

In an audio recording taken before the order of protection was in place, the Defendant called the fourteen-year-old victim a "little lying w--re" and a "b---h." When the Defendant threatened to make the victim's life a "living hell," the victim told the Defendant that she had already done so, and the Defendant insisted that "she could do worse." Also entered into evidence were prior text messages sent by the Defendant to the victim's mother, wherein the Defendant stated that if she wanted to harass the victim's mother she had plenty of tools, the Defendant called the victim a "b---h" and "w--re," the Defendant threatened to ruin Thanksgiving, and the Defendant threatened the victim's brother. In addition, the victim had a history of self-harming by cutting herself, and the Defendant was aware of this behavior.

The Defendant frequently parked near the victim's mother's car in the school pick-up area, positioning herself where the victim would have to walk past her in order to get

to the car. As the victim walked by the car, the Defendant often gave her "dirty looks" and made her feel "very uncomfortable." A photograph taken on April 5, 2016, evidencing such behavior was entered into evidence. Moreover, the Defendant continued in this behavior despite the principal's offer to use the school's rear entrance and allow the Defendant to pick up her daughter in a different area. Even after Officer Frazier instructed the Defendant not to park near the victim's mother's vehicle and utilize a different pick-up area, the Defendant returned to the same location. Officer Frazier indicated to the Defendant that he had spoken with the trial judge that had issued the order of protection and relayed to the Defendant the judge's command that she park behind the school. The victim was aware that the Defendant had been told to park in a different location.

The victim also testified about an occasion where the Defendant followed behind her mother's vehicle one day after they had driven away from school. The victim claimed that there was another route the Defendant could have taken and that the Defendant accelerated towards their car at times. Also, there was evidence that the Defendant took a photograph of the victim on March 23, 2016.

After the incidents outside the school, the victim began cutting herself again, requiring medical treatment for almost a week. The victim testified that she feared the Defendant would not stop "torturing" her until she committed suicide.

Viewed in the light most favorable to the State, the evidence shows that the Defendant repeatedly engaged in willful conduct involving repeated or continuing harassment of the victim through unconsented contact. Here, the Defendant's actions fall within the definition of "unconsented contact," in the form of following or appearing within the sight of the victim in a public place when she was leaving her school. See Tenn. Code Ann. § 39-17-315(a)(5)(A), (B).

Moreover, the unconsented contact would cause a reasonable fourteen-year-old to suffer emotional distress and feel terrorized, frightened, intimidated, threatened, harassed, or molested, and the fourteen-year-old victim actually suffered emotional distress and felt terrorized, frightened, intimidated, threatened, harassed, or molested. Additionally, the contact was initiated without the victim's consent and continued in disregard of her expressed desire that the contact be discontinued. See Tenn. Code Ann. § 39-17-315(f). The summary of the proof above demonstrates that a reasonable trier of fact could have found that the Defendant's numerous acts towards a fourteen-year-old child amounted to a pattern of conduct which evidenced a continuity of purpose. Tenn. Code Ann. § 39-17-315(a)(1).

As for the two alternative elements elevating this offense to aggravated stalking, it was not disputed that the victim was less than eighteen years of age at any time during

-18-

the Defendant's course of conduct and that the Defendant was five or more years older than the victim. See Tenn. Code Ann. § 39-17-315(c)(1)(B). Moreover, there was sufficient evidence that the Defendant knowingly violated the order of protection. See Tenn. Code Ann. § 39-17-315(c)(1)(E). While the Defendant testified that she did not believe the order of protection prohibited her from picking up her daughter from school, the order of protection was entered into evidence, and the jury was free to disregard the Defendant's testimony.

Finally, the Defendant argues that the State, as a matter of law, failed to present sufficient evidence of harassment because her conduct is statutorily excluded as activity which serves the "legitimate purpose" of picking up her daughter from school. See Tenn. Code Ann. § 39-17-315(a)(3) ("Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose."). The Defendant submits that "actions taken for legitimate purposes, even if somehow threatening, simply cannot be stalking." The Defendant continues, "Or to look at it another way, it is only conduct that does not serve any purpose beyond its effect on the victim that is criminalized by statute." The State replies that "the evidence demonstrates that, while the [D]efendant perhaps had a legitimate purpose for being in the general area of the school, this purpose did not extend to the specific area she chose to occupy daily near the victim." The State surmises that "a reasonable trier of fact could conclude that the [D]efendant's conduct in parking behind the victim's mother and glaring at the victim as she approached had no legitimate purpose and was aimed solely at harassing the victim."

In State v. Ellen Becker Goldberg, this court rejected a defendant's argument that "her act of parking and appearing near the victim in public [was] constitutionally protected and served a legitimate purpose." See No. M2017-02215-CCA-R3-CD, 2019 WL 1304109, at *17 (Tenn. Crim. App. Mar. 30, 2019), perm. app. filed (Tenn. May 17, 2019). The defendant in Goldberg cited to City of Chicago v. Morales, for the proposition that she has a due process right to remain in a public place. Id. (citing 527 U.S. 41, 53-54 (1999) (noting that there is a due process right to loiter for innocent purposes and concluding that law criminalizing gang loitering was unconstitutionally vague)). Ultimately, this court concluded that "the statutory definition of harassment was satisfied and that the [d]efendant's conduct . . . was not exempt as constitutionally protected or as activity which serve[d] a legitimate purpose." In so holding, the Goldberg court reasoned as follows:

> However, the language in Morales "cannot be read as the Supreme Court's mandating that a right to loiter in all places deemed 'public' is a fundamental liberty interest." Doe v. City of Lafayette, 377 F.3d 757, 772 (7th Cir. 2004). Indeed, "'the right to travel cannot conceivably imply the right to travel whenever, wherever and however one pleases.'" Snowden v.

State, 677 A.2d 33, 37 (Del. 1996) (quoting Lutz v. City of York, 899 F.2d 255, 269 (3d Cir. 1990)).

Contrary to her assertions, the [d]efendant did not merely engage in activities with a legitimate purpose such as parking on the street, attending a residents' meeting, and eating at the golf club. Instead, the evidence, seen in the light most favorable to the State, show[ed] that the [d]efendant stopped her vehicle in front of the victim's home and stayed in the vehicle for thirty minutes while staring menacingly at the victim, occasionally inching the vehicle forward, and taking photographs. She followed the victim out of a meeting and stood near her and glared, although the [d]efendant's own car was not parked in the vicinity. She also growled at the victim at the golf club. We conclude that a rational trier of fact could have found that these activities served no legitimate purpose but were calculated to harass, intimidate, and terrorize the victim. As such, they were not constitutionally protected acts. State v. Holbach, 763 N.W.2d 761, 766 (N.D. 2009) (the defendant's conduct did not consist merely of shopping, getting gas, and going to a restaurant but was intentional conduct aimed at causing the victim fear, and his conduct was accordingly not constitutionally protected); Goosen v. Walker, 714 So. 2d 1149, 1150 (Fla. Dist. Ct. App. 1998) (concluding that the defendant's conduct of videotaping the neighbor constituted stalking and was not constitutionally protected conduct); Snowden, 677 A.2d at 38 (defendant's act of following the victim on public roads was not constitutionally protected behavior); [People v.] Holt, 649 N.E.2d [571,] 581 [(Ill. App. Ct. 1995)] (concluding that the defendant's act of skating at a public ice rink was not constitutionally protected because the basis of his conviction was surveilling the victim during her reserved skating times with the intent to embarrass and annoy her).

We likewise reject the Defendant's contention that "actions taken for legitimate purposes, even if somehow threatening, simply cannot be stalking." In accordance with Goldberg, we determine that a rational trier of fact could have found that the Defendant's conduct did not serve the legitimate purpose of picking up her daughter from school but was instead calculated to harass, intimidate, and terrorize the victim. The State offered proof that other avenues were available to the Defendant to pick up her daughter from school, and the Defendant chose not to do so even though she was prohibited from "making contact" with the victim by an order of protection. The evidence established that the Defendant knowingly violated the order and that she used the specific pick-up location to carry out the offense of stalking. Therefore, the Defendant's conduct is not exempt from the harassment definition in the stalking statute. She is not entitled to relief.

-20-

## II. *Out-of-Courtroom Incident*

The Defendant argues that the trial court erred in admitting "bad act" testimony concerning the incident where the Defendant and the victim crossed paths outside the courtroom during the lunch recess. The Defendant notes that the trial court did not comply with the procedural requirements of Tennessee Rule of Evidence 404(b). The Defendant urges that, upon our de novo review, we should conclude that the bad act was not established by clear and convincing evidence and that the evidence "was irrelevant, prejudicial, and distracting" because it "became a major focus of the evidence at trial." Furthermore, the Defendant submits that "the trial court's instruction that the jury could use this information only for 'intent or motive' . . . ma[de] little sense, as this evidence shed no light on those topics," and that erroneous admission of this evidence "cannot be considered harmless." The State responds that the Defendant, by failing to offer a contemporaneous objection, has waived any challenge to this testimony and that plain error does not entitle the Defendant to relief. In her reply brief, the Defendant alleges that the issue was properly preserved.

During the trial, the State, while the jury was out of the courtroom, asked to address a matter "that happened during lunch." Detective Brummit was called to the stand and testified that, during the lunch recess, she escorted the victim and her father "out to the patio area" after "they had gone and gotten something [to eat] from the cafeteria[.]" Detective Brummit described that, as she was returning inside to the cafeteria to get herself something to eat, she saw the Defendant, who was accompanied by a young man, walk past her going outside. According to Detective Brummit, the Defendant "was speaking with the young man" before she saw the victim and her father. The Defendant then turned and said something to the young man before she walked "straight back to where" the victim and the victim's father were standing, "passed them, and . . . took a left and started speaking with a lady that was standing there." Detective Brummit estimated that the Defendant passed "within two feet" of the victim and her father.

The prosecutor requested to offer evidence of the incident to the jury, contending that the Defendant was "still exhibiting" stalking behavior even through trial. In making this request, the prosecutor noted that, as she and the victim were coming towards the courtroom door following the lunch recess, the Defendant was also headed towards the door. According to the prosecutor, the Defendant "stopped, walked around the door, just simply stood at the door, crossed her arms, and was staring at [the victim]." The prosecutor and victim went back inside the prosecutor's office, but when they returned to the courtroom entrance "a minute or so" later, the Defendant was "still standing outside the door."

After the prosecutor had finished, defense counsel asked, "May I inquire?" and the trial court responded affirmatively. However, defense counsel stated only, "Officer, do you see in—" before the trial court interjected that it did not "see the need to get into that" "since this [was] behavior that occurred after the indictment date[.]" The trial court indicated that the incident was not relevant "to whether or not [the victim] was afraid that day" but could be used as rebuttal evidence of "whether or not [the Defendant] was intentionally intimidating" the victim. The trial court concluded, "Let's finish the defense proof, and then you can ask to try to put something in rebuttal that goes to intent." Defense counsel averred, "Your Honor, this might be relevant if the [c]ourt— and the jury is not here." Defense counsel was permitted to question Detective Brummit about the identity of the young man, who proved to be the Defendant's son. Defense counsel surmised, "I would assert that it's probably reasonable for a mother to talk to her son. I know nothing about the particulars, but that's not what I would call threatening. I appreciate your Honor's ruling, and we'll go forward." The jury was returned to the courtroom, and trial resumed.

No further discussion ensued at trial before the State elicited rebuttal testimony from the victim concerning the out-of-courtroom incident. After the State concluded its examination of the victim on rebuttal, the trial court held a bench conference. The trial court stated,

> I think I need to give the jury some instruction about that they can't consider this, if they believe it happened, for anything other than intent and motive, because it's—it's another bad act outside of the scope of the indictment. So I'm a little uncomfortable with it now that I let it in.

The trial court then asked defense counsel if he wanted to cross-examine the victim, and defense counsel replied in the affirmative. The bench conference was concluded.

The trial court first issued an instruction to the jury on how it was to consider the testimony regarding to out-of-courtroom incident, instructing as follows:

> You've just heard some testimony about something that allegedly happened outside of the scope of this indictment. So you can't consider any other acts that are outside the scope of this indictment to determine that, well, because the defendant acted this way, they must have acted that way in the past. That really is only introduced to you to determine intent or motive. So you can use it if you think something else happened to—to help you determine if there was some intent or motive to violate the law of which she is, in fact, charged with here. Okay? So you can't use it for any other purpose.

-22-

Defense counsel then cross-examined the victim. After surrebuttal testimony by the Defendant and Ms. Wright, the trial court explained to the jury,

> I want to reiterate this whole last part that we've done on the rebuttal part, that really only goes to intent and motive. It's not substantive evidence of what actually happened then. You can use it if you think something happened to determine whether or not there was an intent, but I just caution you on that. That's all it's—you can't use it for any purpose.

Additionally, prior to closing arguments, the trial court warned the State:

> You know, this last part that we brought in, it's after the fact of the indictment. So I really caution you. I wouldn't dwell on that too much. I don't think it's unfairly prejudicial to the [D]efendant. It's just if you—if you dwell on that, you increase the danger if it was in error. So I would—I don't think that was worth a whole lot, but I don't think it hurt her either.

The State did not reference the out-of-courtroom incident during its closing argument. However, defense counsel argued in closing:

> Although this is a very small thing, at the end of the day the [S]tate brought up the accusations about standing out in the area, and you'll remember, I asked each witness for the [S]ate and for us, to draw a little map. The last three exhibits are the maps drawn by three people to show, from their perspective, what happened. Look at them.
>
> The building structure is part of your common experience. I don't want you to go try and be investigators and look things up, but you can use your commonsense. People walk out onto a walkway and they have a smoke. If you smoke, that's an urge that's damn near irresistible. You have people from different walks of life, all of whom say this woman did nothing aggressive against that young lady.

In cases in which the "issues are only tentatively suggested or the record only partially and incompletely developed[,] . . . [c]ounsel necessarily take some calculated risks in not renewing objections." See State v. Walls, 537 S.W.3d 892, 899 (Tenn. 2017) (citing State v. McGhee, 746 S.W.2d 460, 462 (Tenn. 1988)). Moreover, our supreme court "has further recognized the importance of a contemporaneous objection to procedures utilized by the trial court in addition to evidentiary issues." Id. "Objections to improper procedure must be voiced contemporaneously to give the trial judge the opportunity to correct the error on the spot. In the absence of a contemporaneous

objection, any error was waived." Id. (citing State v. Estes, 655 S.W.2d 179, 186 (Tenn. Crim. App. 1983)) (emphasis added in original).

Here, at the conclusion of the jury-out hearing, defense counsel averred that the Defendant's talking to her son was a reasonable action and was not threatening to the victim. Defense counsel stated simply, "I appreciate your Honor's ruling, and we'll go forward." Defense counsel never lodged a formal objection to admission of the victim's testimony during the initial jury-out hearing, and he remained silent later when the trial court called a bench conference to further discuss the issue. No grounds for any objection were ever identified by the Defendant at trial, so there was never a formal ruling by the trial court. The Defendant's issues with admission of the victim's testimony concerning the out-of-courtroom incident were only marginally suggested, if at all, during trial. We are faced with an incompletely developed record. Accordingly, we are constrained to agree with the State that the issue is waived for the Defendant's failure to raise a contemporaneous objection. See Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); Tenn. R. Evid. 103(a)(1) (noting that error may not be predicated on the admission of evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context"); see also Walls, 537 S.W.3d at 899-900 (waiving the defendant's claim that trial court erred in allowing jury to deliberate late into the night and early morning before reaching a verdict because defense counsel did not make a formal motion or offer further argument in support of his opinion, did not seek a clear and definitive ruling, did not offer further argument or objection despite repeated opportunities, and did not bring the apparent fatigue of one of the jurors to the attention of the court during trial).

In addition, a formal objection to the testimony was not raised until the motion for new trial, and the Defendant[2] argued simply that the trial court "committed reversible error" in allowing the victim to testify "about an incident that supposedly took place during a court recess, and obviously outside the time of the [i]ndictment." At the hearing, defense counsel argued that the victim's rebuttal testimony had "no probative value" and was "highly prejudicial." There was still no objection to the trial court's failure to comply with the procedural requirements of Rule 404(b); the initial error as presented by the Defendant on appeal. Thus, the Defendant's issue was not properly set forth in the motion for new trial with enough specificity to preserve it for appeal under Rule 3(e), and the issue is waived. See Tenn. R. App. P. 3(e) (providing that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for new trial, otherwise such issue[] will be treated as waived"); see also Waters v. Coker, 229 S.W.3d 682, 689 (Tenn. 2007) (requiring that issues presented in the motion for new trial be "specified with reasonable

[2] The Defendant was represented by a different attorney at the time of the motion for new trial hearing.

-24-

certainty so as to enable appellate courts to ascertain whether the issue was first presented for correction in the trial court"); Fahey v. Eldridge, 46 S.W.3d 138, 146 (Tenn. 2001) (waiving the defendant's suppression issue because the motion for new trial did not "assert the legal grounds relied upon by the [trial] court for excluding the expert" or "set forth any legal ground identifying why the court's exclusion was improper").

Plenary review having been waived, our review is limited to plain error. However, the Defendant, even in her reply brief, has failed to request plain error relief as to this issue and, consequently, has failed to provide any analysis of the five factors required for plain error review. See Tenn. R. App. P. 36(b) (providing that, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal"); see also State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)) (outlining the five factors for plain error relief).

Here, the trial court issued an instruction, not once but twice, to the jury on how it was to consider testimony about the out-of-courtroom incident. A jury is presumed to have followed a trial court's instruction. See State v. Reid, 164 S.W.3d 286, 342 (Tenn. 2005) (citation omitted). Moreover, the victim's testimony was brief, and the trial court determined that the testimony was relatively innocuous and was not "unfairly prejudicial." The State heeded the trial court's warning and did not reference the out-of-courtroom incident during its closing argument; instead it was the Defendant who mentioned such testimony. Accordingly, the Defendant has failed to show that a substantial right was adversely affected or that consideration of any error is necessary to do substantial justice. See Smith, 24 S.W.3d at 282. We conclude that plain error review of this issue is not warranted.

CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-25-